## THE ALVENA.

### WELSH et al. v. THE ALVENA.

(Circuit Court of Appeals, Second Circuit. April 8, 1897.)

SHIPPING—SEAWORTHINESS—SUGAR CARGO—INSUFFICIENT INSPECTION.

Sugar in the hold of an iron steamship was damaged by water coming in through a small hole made by corrosion of the acid of sugar drainage and sea water, which reached the plate through cracks in the lining of Portland cement. The evidence was insufficient to show that the cracks were caused by any accident after sailing. Respondents relied on an exception to the bill of lading of damage from unseaworthiness, provided "all reasonable means have been taken" to make the ship seaworthy, and also on the Harter act, which exempts the carrier if he has exercised "due diligence" to make the ship seaworthy, etc. *Held*, that, in the inspection prior to the voyage, a failure to take up one of four ceiling boards in a passageway over the limber spaces, underneath which the leak occurred, in order to examine the cement, was a lack of "due diligence" and "reasonable means" to make the ship seaworthy, and the carrier was not exempted either under the statute or bill of lading. 74 Fed. 252, affirmed.

Appeal from the District Court of the United States for the Southern District of New York.

This is an appeal from a decree of the district court, Southern district of New York, in favor of the libelants and against the steamship Alvena for $2,904.73, for loss and damage to sugar shipped at Savannah La Mar, in Jamaica, and consigned to the port of New York. The sugar was stowed in No. 3 hold, aft of the engine-room bulkhead. The facts are sufficiently set forth in the following excerpt from the opinion of the district judge:

The steamship left Kingston, Jamaica, for New York, on April 3d. At about 1 a. m. of April 8th, water was found rushing into No. 3 hold, coming through a hole in the B strake, the second strake from the keel, on the starboard side of the bottom of the ship, immediately beneath the vertical manhole entrance to the tunnel. The pumps were not, at first, able to cope with the influx of water; but after the water from No. 3 was let into the engine room, and some jettison of cargo was made, they were able to do so. The vessel put into Norfolk, which she reached about 11 p. m. of the 9th. Temporary repairs were made there, and the vessel reached New York in April. A portion of defendant's sugar was damaged by the influx of water. It does not distinctly appear whether any of the plaintiff's sugar was jettisoned or not. The evidence leaves no doubt that the hole in the bottom of the steamer was caused by the corrosive action of the sugar drainage upon the iron plate of the steamer. This corrosive action is well understood. To prevent it, iron steamers intending to carry sugar cargoes have, as the Alvena in this case had, a layer of Portland cement, from five to six inches thick, covering the entire bottom where sugar is expected to be stowed. It is necessary that this layer of cement be kept solid and free from cracks. The explanation of this accident accepted by both sides is that some crack or break in the cement permitted the sugar drainage to work through it so as to corrode the plate beneath. Examination of the hole showed that the cement was gone in an oval space of about five inches by three at the bottom, and sloping upward and outward at an angle of about 60°. The hole in the iron plate was of irregular, ovate shape, nearly 2½ inches long, and nearly 1½ inches wide in the widest part. Around the margin of the hole the iron was eaten down to a very thin edge, and the corrosion extended in a less degree all around about ¾ of an inch back from the edge of the hole, at which distance from the edge the plate was again of the normal thickness of about half an inch. The sugar acid, therefore, had eaten out a saucer-like excavation in the plate over an extent of nearly 5 inches in length by about 3 inches in breadth at the

widest part. Except in the small space about the hole where the cement was' gone, the cement was found to be in good condition. No radiating cracks were observed. The theory of the libelant is that the cement over the hole had become cracked or broken, from some cause, before the voyage began, and that the ship was not properly inspected in that regard, and was insufficient for the voyage. The theory of the defendant is that the crack was caused by a blow during the voyage on the outside of the iron plate underneath the place of the hole, and that the blow was of sufficient violence to break or crack the cement so as to admit the sugar acid.

Everett P. Wheeler, for appellants.
Lawrence Kneeland, for appellee.

Before LACOMBE and SHIPMAN, Circuit Judges.

PER CURIAM. The bill of lading exempted the carrier from liability for loss or damage arising from "unseaworthiness of the ship, provided all reasonable means have been taken to make her seaworthy." The Harter act of February 13, 1893, which is also relied upon, provides that:

"If the owner * * * shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned," etc., "* * * neither the vessel, her owner," etc., "shall become or be held responsible for damage or loss resulting from fault or errors in navigation or in the management of said vessel."

Manifestly, neither the clause in the bill of lading, nor that in the Harter act can be availed of by the ship unless it is shown that "all reasonable means have been taken," or "due diligence exercised," to make her seaworthy; and the two phrases here quoted have the same meaning. When the cement was so cracked as to allow the corrosive sugar acid to come in contact with the iron, she was not in all respects seaworthy to carry such a cargo. And it is also quite clear that "reasonable means" or "due diligence" would call for some sort of an examination of the cement before sailing with such a cargo, to see if it was free from cracks. Much testimony was taken, and both briefs devote much space to argument touching claimant's theory that the crack was caused after sailing, by collision with the bottom or with some floating substance. We are unable to reach any definite conclusion on this branch of the case. It would be mere guesswork to express an opinion either way. All that can be said is that it does not appear what caused the crack. Of course, if it were shown satisfactorily that it was caused as defendant contends, the ship would not be held liable, although it might appear that there had never been any examination or inspection at all before sailing; for such examination, however minute, would not have revealed the particular form of unseaworthiness not then existing, but from which alone damage resulted. Inasmuch, however, as there is not sufficient evidence to show that the crack was caused by some accident after sailing, it becomes necessary for the ship to show such an inspection before sailing as would comply with the requirement that "reasonable means" or "due diligence" be taken or exercised. Upon this branch of the case we are inclined to concur with the district judge that the proof of inspection of the cement bottom was not sufficient to meet this requirement. We do not mean to hold that all the ceiling

boards ought to be taken up before each voyage,—an operation which would take several days, and would require repeated renewals of the ceiling, broken by being torn up when bolted down. It does appear, however, that it is usual to lay such ceilings with a number of boards (one of claimant's witnesses says every third board) loose, and provided with means for readily lifting them. When such a loose board is lifted, it is, of course, practicable to examine the cement under it, and also under the boards adjoining on each side. Quite possibly, such an inspection would not be as thorough as one made after removal of the entire ceiling; but, upon the evidence, it would seem to be all that reasonable prudence or "due diligence" would require, in advance of each voyage with such a cargo, supplemented by more thorough surveys at longer intervals. Before the voyage in question the lifting boards on this ship, or at least those of them that covered the limber spaces running fore and aft, were raised, and the limbers cleaned out, in the course of which operation the cement in the vicinity was sufficiently examined. Had there been lifting boards over the limbers in this part of the ship, it would seem that this crack, if it then existed, would have been discovered by such inspection. But the difficulty with the case is that in that part of the ceiling which forms the floor of a passageway between the tunnel shaft and an adjoining water tank, for a considerable distance, there are no lifting boards at all. The passageway has a width equivalent to that of about four boards, but each line of boards in it was so securely fastened that they could be torn up only at the risk of breaking them. It would seem to be a reasonable requirement that the usual facilities for inspection should have been provided in this part of the ship as well as elsewhere. Had they been provided and availed of, the inspection, no doubt, would have met the requirements of the bill of lading or the Harter act. But, not being provided, and no inspection being had at all of the cement in this part of the ship, such requirements would seem not to have been complied with, especially in view of the evidence that it was comparatively easy to get below the ceiling of this passageway by entering the tunnel shaft through a manhole, the tunnel shaft having no ceiling. It was in this way that the leak was discovered by the engineer. It appears, then, that it is usual to have lifting boards over the limber spaces, and usual to lift them before sailing, in order to clear out the limbers so far as they run fore and aft; that, had boards been lifted for the full run of the limbers, the place where this leak developed would have come within the range of inspection; that no boards were lifted from so much of the limbers as lay below the passageway, in consequence of which the place where this leak developed did not come within the range of inspection, as it otherwise would have done. We concur, therefore, with the district judge in the conclusion that libelants were entitled to a decree for the damage sustained. The decree of the district court is affirmed, with interest and costs.