## THE FRIESLAND.

### (District Court, S. D. New York. September 18, 1900.)

1. SHIPPING—DAMAGE TO CARGO—LIMITATION OF LIABILITY.

A provision of a bill of lading exempting the carrier from liability for loss or damage occasioned by unseaworthiness, provided the owners had exercised due diligence to make the vessel seaworthy, leaves upon the owners the burden of proving such due diligence, which includes thorough and careful inspection.

2. SAME—INSPECTION OF PIPES.

A cargo was injured by sea water which entered the vessel through a hole which had been worn and eaten by corrosion through the iron bottom of a valve chest three-eighths of an inch thick. The peculiar liability to corrosion of iron in such place was well known, and, while there was evidence of inspection, it was not specific as to manner in which such inspection was made, and it did not appear that the valve chest had ever been removed for examination since it was placed in the ship nine years before, or even that the valve itself had been taken out. Held, that such evidence did not show reasonably careful inspection, such as was incumbent upon the owners under a provision of the bill of lading requiring them to exercise due diligence to make the vessel seaworthy, in order to exempt them from liability.

In Admiralty. Suit to recover damages for injury to cargo.

Butler, Notman, Joline & Mynderse, for libelants.
Robinson, Biddle & Ward, for respondent.

BROWN, District Judge. On a voyage of the Friesland from Antwerp to New York in October, 1898, four shipments of libelants' goods were damaged by sea water, which gained access through a leak in the valve chest through which one of the steerage closets was discharged. The libel was filed to recover the damages. The evidence shows that the bottom of the valve chest, which was of cast iron and three-eighths of an inch thick, had become worn away by the combined action of corrosion and the play upon it of the valve, so that a circular hole about three-eighths of an inch in diameter was made, through which the sea water came in and did the damage. The chest was made fast to the side of the vessel inboard and had an opening to the sea. The valve inside of the chest, and about four inches inboard, was of brass, oblong in shape, and weighed about eight pounds. It was supported by brass pivots or pintles, which rested in cast iron sockets or pockets near the top of the valve chest. The valve swung outward from the pipe, so as to permit the discharge of the contents of the waste pipe; but at the bottom it swung back against a shoulder or stop, so as to prevent ingress of sea water into the pipe beyond the valve. There was originally about a quarter of an inch of free space between the bottom of the valve and the iron chest. Through the combined effects of corrosion and wear it was found on examination that the pintles had dropped fully half an inch in their original supports, permitting the valve to drop that distance from its original position until a hole was worn through the bottom of the chest, as above stated.

The iron chest was so placed that examination of the interior was difficult. There was a cap upon the top of the chest, which could be easily removed, and through this the valve could be taken out, and

when that was done some examination of the inside of the chest could be made showing the wearing of the pockets and the dropping of the valve; and the bottom of the chest could then be seen through the pipe from the outside of the ship. The chest could also be detached from the side of the vessel. It was the habit of the respondent to make an inspection of all the steerage closets upon each voyage. Once a year there was a general overhauling. The vessel had been running about nine years. The chest and valve are the same that were originally put in. The bill of lading contains the following among its exceptions:.

"It is also mutually agreed that the carrier shall not be liable for loss or damage occasioned by * * * any latent defect in hull or machinery or appurtenances * * * or by unseaworthiness of the ship at the time of shipment or the commencement of or any period of the voyage, provided the owners have exercised due diligence to make the vessel seaworthy."

Assuming the validity of this stipulation (The Carib Prince, 170 U. S. 655, 18 Sup. Ct. 753, 42 L. Ed. 1181) the question presented is, whether the evidence shows the exercise of due diligence by the respondent to make the steamer seaworthy as respects the condition of the valve chest.

The question involved has been several times before this court in different forms. The burden of proof, it has been held, is upon the shipowner. The exemption in the shipowner's favor is in derogation of the shipper's ordinary rights and remedies; it respects losses over which the shipper can exercise no control, but which are to a certain extent within the control of the carrier by the exercise of the requisite care and diligence in inspection. In the case of The Edwin I. Morrison, 153 U. S. 199, 215, 14 Sup. Ct. 823, 38 L. Ed. 688, it was held to be the duty of the owner to make such necessary and proper inspection from time to time as might give assurance of the seaworthiness of the vessel; and in The Phœnicia (D. C.) 90 Fed. 116, affirmed in 40 C. C. A. 221, 99 Fed. 1005, the absence of a thorough and careful inspection, it was held, made the ship chargeable with the loss. See, also, The Majestic (D. C.) 56 Fed. 244, affirmed in 166 U. S. 375, 17 Sup. Ct. 597, 41 L. Ed. 1039; Dobell v. Steamship Rossmore Co. [1895] 2 Q. B. Div. 408, 413, 415.

The stipulation in the bill of lading releases the shipowner from responsibility for absolute seaworthiness, provided due diligence is exercised; but it does not release him, nor does it profess to release him in the least from his previous obligation to make such careful inspection as the circumstances require.

In the present case the evidence seems to me not to show such reasonably careful inspection of the interior of the valve chest as was incumbent upon the respondent under his obligation to exercise "due diligence," and to afford a corresponding reasonable protection of the shipper's goods. The special liability of iron to the effects of corrosion in the circumstances of this chest and valve was well known. On account of this liability, the employment of iron chests in British usage had been for many years discarded, and brass required instead. It is evident that the corrosion and wear in this case, in order to have gone through the bottom of the chest three-

eighths of an inch in thickness, must have been in gradual progress for a very considerable time. There was no unusual occurrence on this voyage, no heavy weather or strain, which could have produced any sudden rupture in the bottom of the chest; nor was the hole of that description. The corrosion went on with the lapse of years until the bottom was worn and rusted out. It is evident that this is not consistent with any actual careful inspection of the interior of the chest for some years preceding. The evidence taken by commission as respects the kind of inspection made is brief and unsatisfactory. It does not appear that the chest was ever taken out for examination from the time it was put in some nine years previous to this damage, or that the valve itself was taken out for the purpose of seeing better how great was the wear at the bottom. The removal of the cap alone was sufficient to make visible the very considerable dropping of the pintles in the pockets that supported the valve; and if the difference in the construction of the different chests and valves was such as to make the great depth of the pintles in the pockets no certain indication of unusual wear or dropping from the original position, the necessity of an occasional removal of the chest from the side of the vessel for careful examination is the more evident.

On the whole I cannot resist the conviction that there had long been a failure to make any such real and careful examination of the interior of these chests as their known liability to corrosion reasonably required, and that consequently there was not such "due diligence" exercised as the condition of the bill of lading required.

Decree for the libelants, with costs.