## THE BILL.

### BRAZIL OITICICA, Ltd., v. THE BILL et al.

No. 2533.

District Court, D. Maryland.

Nov. 28, 1942.

Lord & Whip and Geo. W. P. Whip, all of Baltimore, Md., and Bigham, Englar, Jones & Houston, Henry N. Longley, and F. Herbert Prem, all of New York City, for libelant.

Ritchie, Janney, Ober & Williams and Robt. W. Williams, all of Baltimore, Md., and Hatch & Wolfe and Carver W. Wolfe, all of New York City, for claimant.

CHESNUT, District Judge.

This admiralty case is a libel in rem to recover for a cargo loss. On January 24, 1942 Brazil Oiticica, Ltd., S/A shipped 385,000 kilos (848,925 lbs.) of oiticica oil at Ceara, Brazil, in the starboard and port deep tanks of the SS "Bill", for carriage to New York. Approximately 190 long tons (425,600 lbs.) of the oil were stowed in the starboard deep tank. When stowage of the oil was completed the depth of the oil in that tank was 20 feet with an ullage of about 3 feet. Upon the arrival of the vessel in New York there remained only a few inches of oil in the starboard tank, nearly all of the oil having been pumped overboard during the course of the voyage. The reason for this was that a small hole developed in the bilge pipe extending along the bottom of the starboard deep tank which permitted the oil to flow forward through the pipe into the

bilge well from which it would have overflowed into the bilges along the sides of the forward holds of the ship and then into the forward holds. Ordinarily the non-return valve in the bilge line between the forward bulkhead of the deep tank and the bilge well would have prevented the oil from flowing into the bilge well; but the valve had become glued or stuck open by the oil, which thus drained from the deep tank through the hole in the bilge pipe into the bilge well. Practically all of the oil in the starboard tank was thus pumped overboard through the bilge line to prevent damage to the other cargo in the forward holds. The libelants assert that the value of the oil lost was approximately $100,000.

The SS "Bill" owned by the respondent was a general ship engaged for the common carriage of merchandise. The presence of the oil in the bilges was first discovered on February 9, 1942 when the ship was approximately off Cape Hatteras. It was pumped out on that and two succeeding days. The bill of lading issued January 24, 1942 recited that it was subject to the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, 46 U.S.C.A. § 1300 et seq. Section 1303 (1) provides:

"The carrier shall be bound, before and at the beginning of the voyage, to exercise due diligence to—(a) Make the ship seaworthy; * * * (c) Make the holds, refrigerating and cooling chambers, and all other parts of the ship in which goods are carried, fit and safe for their reception, carriage, and preservation." and

"(2) The carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried."

Section 1304(1) provides:

"(1) Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned, equipped, and supplied, and to make the holds, refrigerating and cool chambers, and all other parts of the ship in which goods are carried fit and safe for their reception, carriage, and preservation in accordance with the provisions of paragraph (1) of section 1303 of this title. Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other persons claiming exemption under this section.

"(2) Uncontrollable causes of loss. Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship; * * * (p) Latent defects not discoverable by due diligence; and (q) Any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage."

As hereinafter more fully stated, the cargo loss in this case was proximately caused by the unseaworthiness of the ship, and therefore the principal question in the case is whether under the facts, not greatly in dispute, the shipowners had exercised due diligence to make the ship seaworthy, and safe for the carriage of the oil. Most of the evidence in the case was submitted in open court but there were also some depositions of most of the officers of the ship which, after its release, upon stipulation filed, has since been sunk or otherwise lost as a result of enemy action. The structural design of the ship becomes of importance in determining the principal question of fact in the case as to the exercise of due diligence by the shipowner. From the evidence in the case I make the following *findings of fact.*

1. The SS "Bill" was built in Norway in 1939 as a cargo carrying ship of 4,020 tons dead weight, 316 feet long and 47 feet wide. It was built in accordance with the rules of Norske Veritas. A plan of the ship is in evidence. The port and starboard deep tanks were located between the forward hold and the fire room. The forward hold was forward of the deep tanks. The skin of the ship formed the bottom of the deep tanks. There were double bottom tanks under the forward hold but not in the deep tanks. In the forward hold the double bottom tanks were so constructed as to leave a shallow fore and aft bilge gutter 8 inches deep along the ship's sides. This fore and aft bilge gutter was designed to collect any sweat and seepage around the rivets, which might run down the ship's side, and lead it to the after end of the hold

where there was a bilge well extending inboard from the ship's side a distance of 7 feet 2 inches, 2 feet fore and aft, and with a depth of 33 inches. The margin plate covering the outboard portion of this well was pierced by two holes through which water drained aft could reach the well. A sounding pipe extended from the bilge well to the main deck.

2. The vessel was equipped with a bilge pump in the engine room. From that pump a pipe led from the engine room through the fireroom to a manifold located a few inches aft of the forward fireroom bulkhead which also formed the after bulkhead of the deep tank. The bilge suction pipe line serving the after starboard bilge well of the forward hold extended down from this manifold a distance of approximately 5 feet into a dry well immediately aft of the fireroom bulkhead; it then turned and was made fast by a flange to the fireroom bulkhead. Thence it extended through the starboard deep tank, was made fast by a flange to the forward bulkhead of the deep tank, passed into the after end of the double bottom tank of the forward hold, curved outboard and connected to a non-return valve made fast to the inboard side of the starboard after bilge well of the forward hold. This bilge pipe ran through the entire length of the starboard deep tank generally level to the skin of the ship and less than a foot from the skin. The fore and aft length of the starboard deep tank was approximately 15 feet. The portion of the pipe immediately forward of the after deep tank bulkhead about 3 feet in length was constructed of steel which was more adaptable to the expansion bend of the pipe at that point. The remainder of the pipe in the starboard deep tank was constructed of cast iron.

3. Before the oiticica oil was placed in the deep tank at Ceara, Brazil, an examination of the deep tank was made to see that it was clean and proper for the reception of the oil. No test was made of the integrity of the bilge pipe at that time other than a very casual visual examination in which some one ran his hand along the pipe or some portion of it. From time to time in the ordinary course of the ship's routine the bilges are tested and occasionally some pumping is done therefrom, but this is not apparently of sufficient special importance to note in the log. There was some evidence of pumping of the bilges of the ship shortly before the ship reached Ceara, but it is not clear that the bilges were pumped after she left that port on her voyage to New York until February 9. No one in the crew of the ship suspected that there was any defect in the bilge pipe, and none was discovered until February 9, when the ship was approaching Hatteras, it was found that there was about 24 inches of oil in the starboard bilge well. The bilge line was then pumped but a few hours later there was an equal amount of oil in the bilge well. It was feared that this would overflow into the forward holds and damage the cargo there unless the bilge well was kept pumped out. Accordingly the oil was pumped from time to time from the bilge well until the level of the oil in the starboard tank was below the bilge pipe.

4. After the ship had docked at New York a steam test was made on the bilge pipe which developed the fact that there was then a hole in it (about 5/8 of an inch by 1/2 inch), the presence of which had been definitely suspected as a result of the necessary pumping. This hole was in the steel portion of the pipe immediately forward of the after bulkhead of the starboard deep tank. This portion of the pipe was removed and on chemical and metallurgical tests it was found that it had corroded from the inside as a result of the action of sulphurous acid in combination with copper salts. The inside of the steel pipe for some distance was encrusted with sulphur and copper salts. On removing some of this encrusted substance, other holes were opened in the pipe, and still other adjacent portions of the pipe were found to be practically paper thin. The original wall of the pipe was about 3/8 of an inch in thickness, and the inside diameter of the pipe was 3 inches. As the length of the pipe in the starboard tank was approximately level with the skin of the ship, and as the ship was trimmed aft as she lay in the water, the pipe would naturally retain some liquid in its after portion just forward of the after bulkhead of the starboard tank, before the pipe made an upward verticle bend. In other words, the residue in the bilge line remaining after pumping ceased naturally drained aft and accumulated in the steel length at the after end of the tank. This trapping of a stagnant liquid in a pipe leads to much greater corrosion than when the liquid is being actively pumped through the pipe. Steel is much more subject to corrosion either from sea water and sulphurous acid, than is cast iron; and the evidence shows the metal-

lurgical fact that when a line of pipe contains a length of steel with other lengths of cast iron the corrosion of the steel length is greatly increased while that of the cast iron lengths is retarded. It appears from the evidence that only a minority of ships are constructed with bilge pipes passing directly through the deep tanks as they did on the SS "Bill". Much more frequently the bilge lines pass through the double bottoms tanks under the deep tanks, or some times they are encased in pipe tunnels, or are led along the sides of the ship separated from the deep tanks.

5. The seepage of the oil into the bilge pipe would not have resulted in its flowage into the bilge well except for the fact that the non-return valve previously mentioned became stuck open by the glutinous action of the oil. This valve was designed to be opened automatically by the vacuum set up by the use of the bilge pump. As soon as the pump ceased operation the valve head was designed to fall into place and cut off any flow of liquid from the pipe line into the bilge well. There was no method of opening or closing the valve from the main deck. In recent years many American ships are equipped with a device for that purpose which is called a "reach rod", which permits the closing of the valve from the main deck. A rule of the American Bureau of Shipping requiring such reach rods was referred to by an experienced witness.

6. By a proper interrogatory at the trial the libelant called for a statement of the cargoes which had been carried in the forward holds of the ship on her several voyages prior to the one in question. Owing to the loss of the ship only a part of the stowage plans were available, and the ship's log generally did not particularize the cargo carried. However, it did affirmatively appear from the stowage plans that were produced that the ship had carried three full cargoes of sulphur in bulk in 1940. The danger of corrosion of steel or iron from the carriage of sulphur is well known in the trade. Commercial sulphur is finely powdered and readily sifts between the ceiling and limber boards to a vessel's tank tops and bilges. It is not soluble in water; but when it becomes wet it forms sulphurous acid which eats into steel and iron, and that acid will continue to be formed so long as the damp sulphur remains in the vessel. The ship's log showed that when one cargo of sulphur was loaded at Galveston in July 1940 it became heated, and water was played on it in both forward and after holds. One purpose of dampening sulphur is to lessen the danger of explosion from sulphur dust. There was evidence of experts that it is imperative to keep bilges free of sulphur to avoid damage to the vessel. There was no evidence in this case that the bilges of the ship were cleaned subsequent to the carriage of the sulphur cargoes. The pumping of the starboard bilge subsequent to the carriage of sulphur without thoroughly cleansing naturally carried sulphurous acid into the bilge line and some of it diluted with sea water was bound to remain in the steel length of the pipe.

7. Prior to the particular voyage oiticica oil had been carried on two occasions and its glutinous nature was known. On February 9, 1942 when the presence of the oil was discovered in the bilge well (cofferdam) and continued to flow into it after pumping, it was realized by the crew that there must be a hole in the bilge pipe in the starboard deep tank, and also that the non-return valve had become stuck open from some cause; but as the valve was inaccessible owing to the stowage of heavy bulk cargo around it in the forward hold, it could not be reached. No oil could reach the forward hold by way of the starboard bilge pipe unless that pipe in the course of its length in the deep tank, became perforated and the non-return valve was stuck open. If there were holes in the bilge pipe oil would readily fill it but would not flow beyond the valve into the forward hold if the valve was operating properly. After the valve was opened and the cargo had been discharged at New York it was found to be structurally good, but the oiticica oil had caused the valve head spindle to stick in the bonnet, thus hanging the valve open and permitting the oil to flow into the forward bilge well.

8. It is not clear from the evidence whether the corrosion had completely perforated the pipe at Ceara, but it is clear enough that if not then entirely perforated, the wall of the pipe had been corroded away to such an extent that it was paper thin at or about the place where the hole subsequently was discovered. This hole was then of irregular outline but approximately $5/8$ of an inch long and $1/2$ an inch wide. The evidence is also unsatisfactory as to whether and to what extent the *starboard* bilge was pumped either shortly before or after leaving Ceara. Pumping of the bilges is an ordinary routine matter and is not customarily entered in the ship's log.

When the starboard bilge was pumped on February 9, it is quite probable that the bilge pump sucked for a few minutes, causing the non-return valve to open, and when the pump was stopped the lid did not fall into place because the valve spindle covered with oiticica oil was stuck in the bonnet. The loss of the oil was due to an unfortunate combination of adverse circumstances; first, a hole in the pipe; second, the glutinous character of the oil, and finally the inaccessibility of the valve. A loss of this kind was practically unprecedented in the experience of marine surveyors.

9. With respect to due diligence to have avoided this loss, the evidence shows that nothing whatever was done by the ship-owners or the crew. They were apparently entirely unaware of the possibility of the danger and therefore no inspection or tests were made with respect to the integrity of the bilge pipe. It seems to have been assumed that so long as the bilge pump worked there was no necessity to apply any special tests. If the trouble had been suspected there were several tests that could have been applied to develop leaks in the pipe if they existed. Thus steam, water or air under pressure might have been led into the bilge lines when the tank was empty; or a so-called hydrostatic test could have been made by filling the deep tank with water or any other liquid, and removing the cover from the bilge manifold in the fire room. These are recognized tests which could normally have been employed to determine the tightness of the pipe. As we have noted, after the voyage ended at New York the steam test was applied and at once developed the existence of the hole in the pipe. No such test had ever been made of the bilge line since the ship was first placed in commission in 1939. She was not due for a general overhauling or inspection until 1943. The ordinary life of a bilge pipe is at least 7 years but when exposed to corrosive action of sulphur and copper salts the integrity of the pipe would be much shorter lived. The master and crew were apparently entirely unaware of the chemical and metallurgical effects of copper and sulphur salts in combination with sea water on steel itself in combination with cast iron forming the length of bilge pipe. The inspection that was made of the deep tank at Ceara before filling it with oil was merely for cleanliness.

10. As ultimate facts I find:

1. The hole in the pipe was caused by corrosion from the inside due to the action of sulphurous acid and copper salts in combination with sea water. This foreign matter in the pipe resulted from residual deposits in the bilge gutters coming from the sulphur cargoes carried in bulk and other forms of cargo that must have contained copper in some form. These deposits in the bilges could have been avoided by thorough cleansing of the holds and bilges promptly after the carriage of the particular cargoes; but there is no evidence that there was such necessary cleaning. The process of eating through the pipe by acid deposits trapped therein was a slow one lasting over a long period of time. The condition of the bilge pipe in the starboard tank at Ceara when the oil was placed therein was such that the starboard tank was not safe for the reception, carriage and preservation of the oiticica oil; and in this respect the ship was unseaworthy at the start of the voyage.

2. The proximate cause of the loss in this case was the condition of this bilge pipe and the loss was thus caused by unseaworthiness of the ship at the time of beginning the voyage.

3. The evidence shows that the shipowner and its agents, the master and crew of the ship, failed to exercise due diligence to make and keep the ship fit and seaworthy with respect to the carriage of the particular cargo.

The necessary *conclusion of law* is that the ship is liable for the loss of the oil and the libelant is entitled to a decree for the value of the oil as hereafter properly determined, with costs of the suit.

## Opinion.

In this case the ship was unseaworthy at the start of the voyage and this unseaworthiness was the proximate cause of the loss. In this situation there is no substantial difference between the liability of the ship under the Harter Act, 46 U.S.C.A. §§ 190–195, and the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq. Robinson on Admiralty, § 71; Benedict on Admiralty, 6th Ed. Vol. I, p. 291; Knauth on Ocean Bills of Lading, (1937) pp. 122, 133, 138; May v. Hamburg, etc., (The Isis), 290 U.S. 333, 54 S.Ct. 162, 78 L.Ed. 348.

The bill of lading in this case expressly was made subject to the Carriage

of Goods by Sea Act which would anyhow have been applicable as a matter of law as the voyage was from a foreign port to the United States. §§ 1302 and 1312. The liability of the ship and carrier is prescribed by the statute in section 1303 and the rights and immunities of the carrier and the ship in section 1304. The particularly applicable portions of these sections have heretofore been quoted. The substance of the statute applicable to this case is the requirement that the carrier, before and at the beginning of the voyage, must exercise due diligence to make all parts of the ship in which goods are carried fit and safe for the reception, carriage and preservation of the goods; but the carrier and the ship are not liable for damage resulting from unseaworthiness unless caused by want of due diligence. However, when loss results from unseaworthiness the burden of proof is on the carrier claiming the exemption.

■■■ The measure of due diligence is the same under the Harter Act and the Carriage of Goods by Sea Act and therefore decisions under the former Act are equally applicable here with respect to what constitutes or fails to constitute due diligence. But in the final analysis due diligence depends upon the facts and circumstances of the particular case and therefore prior decisions are not really helpful except insofar as they state general principles or involve similar facts.[1] As a general principle, due diligence to make a vessel seaworthy is that which would or should be exercised by a reasonably competent vessel owner. And this must be determined in each case on the facts known or which should have been known to the shipowner or its agents. The R. P. Fitzgerald, 6 Cir., 212 F. 678. And in this connection the duty of the vessel owner to exercise due diligence is not satisfied by delegating that duty to the master or crew of the ship. The master and crew must also exercise due diligence.

International Nav. Co. v. Farr & Bailey Mfg. Co., 181 U.S. 218, 224–226, 21 S.Ct. 591, 45 L.Ed. 830.

The question of due diligence in this case is presented in a form different from that of many cases. The question here is not whether acts, inspections or precautions taken by the shipowner or the crew constituted due diligence, but rather whether the circumstances of the loss were such that the ship and its crew were excused from the necessity of taking any precautions whatever to avoid the loss. It is true that the loss here was of an unprecedented nature and resulted from a combination of circumstances. The master and crew did not suspect the existence of the damage and therefore took no precaution to avoid it. The real question thus seems to be whether on the known facts precautions should have been taken to avoid the loss.

What then were the facts which were known? The ship was only three years old. It is not asserted by the libelant that when first put into commission she was unseaworthy by reason of her design and structure. But as has been noted, the structural design of the ship presented a number of somewhat unusual features which in combination created the hazard which resulted in the loss and which, known of course to the shipowner, required more than ordinary care to avoid damage to cargo in the deep tanks. The most important fact is that the bilge line ran through the bottom of the deep tank in immediate contact with the oil, and not separated from it by any cover such as a double bottom, or an encasing tunnel, or along the side of the ship and insulated from the contents of the deep tank. Then again the construction of the pipe was somewhat unusual in that it consisted in part of a steel section and in part of cast iron. The steel section was used to permit an expansion bend and was located in such

---

[1] In Knauth on Ocean Bills of Lading, supra, p. 133, the author says: "'What is due diligence'. The courts have refused to state a definite formula, and judge each case on its facts, keeping the shipowners in the dark until the event is known. This attitude undoubtedly stimulates the shipowners strongly to err in the direction of being over-diligent. If the ship and cargo arrive safely, obviously there has been adequate diligence, or good luck. If the ship is lost, or arrives with a damage, the question is whether the loss was due to lack of due diligence to make seaworthy, etc., or to a sea peril, Act of God or latent defect, operating in spite of the exercise of due diligence. The general statement in The Silvia, 1898, 171 U.S. 462, 464 [19 S.Ct. 7, 43 L.Ed. 241], that a ship must be 'reasonably fit to carry the cargo which she has undertaken to transport', considering the season and the waters to be crossed, remains the basis of the extensive gloss developed by the cases."

a position that it naturally trapped a portion of the contents of the bilges not exhausted by ordinary pumping. The safety of the oil in the deep tanks thus depended vitally upon the integrity of this pipe, as the oil was immediately in contact with the pipe which was subject to the pressure of the whole tank full of oil. Still again the non-return valve was so located in the forward hold that it was inaccessible by reason of the bulk cargo surrounding it. Nor, when it became stuck open, could it be controlled by reach rods operated from the main deck. Furthermore, the master knew that the ship had carried three bulk cargoes of sulphur since 1940 and it was common knowledge that sulphur cargoes are apt to cause corrosion when in contact with steel or iron. The ship had also previously carried two cargoes of oiticica oil which was known to be of a heavy glutinous nature. The design and location of the bilge pipe were such that residual deposits from the sulphur cargo in the forward holds would naturally drain into the bilge well unless the holds were thoroughly cleaned after the cargoes had been discharged. The burden of proof to show due diligence was on the ship and it failed to produce any evidence that the ship's holds and bilges had been properly cleaned after the sulphur cargoes were discharged. This I think is important in considering the evidence as a whole. It is something which could and should have been done but the evidence fails to show that it was done. Apart from the failure to show that it was done, it is inferable that it was not done, otherwise the pipe would not have corroded.

The question then is whether, in view of these known facts, the master of the ship should have been put on notice that there was potential danger to the integrity of the unprotected bilge pipe in the deep tank which was immediately subject to the pressure of the tank full of heavy oiticica oil. After extended consideration, I have reached the conclusion that under all these circumstances the crew of the ship were not justified in taking no precautions whatever to ascertain whether the bilge pipe was still sound.

The ship owner and the crew must of course be held to familiarity with the particular construction and design of the ship and its apparatus, and with the characteristics and effect of particular cargoes which the vessel carried. When loss occurs due to a combination of facts arising from particularities or peculiarities of ship construction in combination with cargo carried, it is not a sufficient defense to the ship to plead ignorance of the ship's agents with respect to such matters. Standard Oil Co. of N. Y. v. Clan Line Steamers, Ltd., 1924 A.C. 100; The Schwan, 1909 A.C. 450; Bank Line v. Porter, 4 Cir., 25 F.2d 843, 845; The Ferncliff, D.C.Md., 22 F.Supp. 728, 735, affirmed 4 Cir., 105 F.2d 1021; Smith v. The Ferncliff, 306 U.S. 444, 59 S.Ct. 615, 83 L.Ed. 862.

As the loss in this case was due to a combination of particular adverse circumstances, and was substantially unprecedented, it is not surprising that prior decided cases fail to present entirely similar facts. However, there are several cases which involve some similar features. The Alvena, 79 F. 973; and Julia Luckenbach, 235 F. 388, both second circuit cases, involved situations where the ships' plates below the water line were eaten through by the corrosive effect of acids resulting from sugar cargoes thus admitting sea water which damaged the cargo, for which loss the ship was held liable. And in The Friesland, D.C., 104 F. 99; Id., 2 Cir., 113 F. 1018, the ship was held liable for damage to the cargo resulting from sea water which entered the vessel's hold because of corrosion of a sea chest made fast to the ship's side. In the case of the Schwan, supra, the damage to cargo resulted from the failure of a non-return valve in the bilge to be properly operated through the ignorance of the chief engineer of the design of the special valve. And in a very recent case decided under the Carriage of Goods by Sea Act the cargo damage resulted from the freezing and breaking of a water pipe which caused damage to a cargo of wheat. Spencer Kellogg & Sons v. Great Lakes Transit Corp., D.C. Mich., 32 F.Supp. 520. In that case the cause of loss was also unprecedented in the experience of the shipowner and crew and no precautions had been taken to avoid the danger.

The principal argument for the ship to show due diligence was that the loss was unprecedented, that the master and crew had no knowledge of the chemical and metallurgical effects of sulphur and copper salts in combination with sea water on bilge pipes; did not suspect the existence of danger and therefore were not reasonably called upon to do anything to

avoid the danger. Particularly there is stressed the fact that it was not customary to make any inspection of the bilge line other than pumping in the ordinary course of ship management; and that so long as the pumps worked, there was no reason to suspect any trouble. We may assume that this state of mind acquitted the master and crew of conscious or intentional negligence, but it is not sufficient under all the circumstances of the case to excuse the ship from positive diligence. In Tex. & Pac. R. Co. v. Behymer, 189 U.S. 468, 470, 23 S.Ct. 622, 623, 47 L.Ed. 905, it was said: "What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not". And in the Indrapura, 9 Cir., 190 F. 711, 714, where the ship was held liable for cargo damage caused by a broken pipe without a proper valve, it was said: "But, while it is proper to consider evidence of the usual custom of ship owners and the usual method of construction of ships and their appliances, such evidence is not necessarily conclusive. It may be rejected altogether where the construction is obviously defective." See also The Charles Rohde, D.C.Md., 8 F.2d 506. In the R. P. Fitzgerald, 6 Cir., 212 F. 678, 684, the court said, in considering the degree of care required from the vessel owner, that "he will be required to take such precautions as are reasonably adequate for the protection of the cargo against known perils, or which reasonable foresight may have anticipated." And in Bank Line v. Porter, supra, it was said: "Knowledge of facts that may be reasonably expected to lead to certain results imposes a direct liability for those results". And also that "If there is any doubt as to the seaworthiness of the vessel, that doubt 'must be resolved against the ship owner and in favor of the shipper.'"

The thing that was here done customarily was merely the ordinary routine pumping of the bilges. Because this disclosed no trouble in the bilge line, it was assumed that no further attention was required to the bilge pipe. Ordinarily the bilge pipe is not so located with respect to cargo that the safety of the cargo is vitally dependent upon the integrity of the bilge pipe line. In the present case, however, the somewhat unusual construction and location of the bilge line, in connection with the former use of the ship, required something more to have been done. The mere customary pumping of the bilges was therefore not due diligence.

█ The ship owner also contends that the condition of the bilge pipe at Ceara constituted a latent defect and therefore claims immunity under section 1304(2) (p) which provides that the ship shall not be responsible for loss or damage arising or resulting from "* * * (p) Latent defects not discoverable by due diligence". It is further argued that if the defect was latent the burden of proving lack of due diligence in discovering it is upon the libelant, as is the case where the ship owner shows the existence of other causes of loss under 1304(2) (a) to (p). The Valescura, 293 U.S. 296, 304, 55 S.Ct. 194, 79 L.Ed. 373; Robinson on Admiralty, pp. 505, 506, 523; Knauth on Ocean Bills of Lading, p. 138. See, also, Commercial Molasses Corp. v. New York Tank Barge Corp. 314 U.S. 104, 109, 62 S.Ct. 156, 86 L.Ed. 89. It may be doubted that the ship owner is entitled to immunity merely by showing that a latent defect was the cause of the loss, thus shifting the burden of proof as to diligence to the libelant; because the whole of the excepted cause of loss in section (p) is latent defects "not discoverable by due diligence". In this particular case the burden of proof, meaning thereby the necessity of going forward with the evidence, becomes unimportant in this particular respect as all the evidence is already before the court and the question is whether or not on that evidence due diligence is shown. More importantly the contention is untenable because the defect in the bilge pipe was not a true latent defect. The defect in the bilge pipe was not due to any flaw in the metal, but to the corrosive effect of foreign substances resulting from the use of the ship. A latent defect is one that could not be discovered by any known and customary test. The Carib Prince, 170 U.S. 655, 658, 663, 18 S.Ct. 753, 42 L.Ed. 1181; The Citta di Palermo, D.C., 226 F. 522, 526. Such cases as the Quarrington Court, 2 Cir., 122 F.2d 266, and The Indrani, 2 Cir., 177 F. 914, cited by counsel for the shipowner are really not in point here because the damages there resulted from a sudden and fresh breaking of pipes caused by a flaw or defect in the metal, and were not the result of gradual deterioration as happened in the instant case.

█ It is also argued for the shipowner that the oil leaked through the non-re-

turn valve by reason of a temporary obstruction in the valve. This is only speculation or at best a very uncertain inference based on the fact that a bean of some kind was found in the expansion bend of the pipe when it was taken down. There is no substantial evidence to support the theory advanced.

■ It is also contended for the shipowner that the cause of the loss is within the ship's exemption from liability as stated in section 1304(2) (a) which provides that the ship shall not be responsible for loss or damage resulting from "Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship". Here the pumping of the oil overboard by the master, rather than the hole in the bilge pipe, is treated by the shipowner as the proximate cause of the loss. The British King, D.C., 89 F. 892, affirmed 2 Cir., 92 F. 1018; and The Sandfield, D.C., 79 F. 371, are cited in support of the proposition that the failure to pump the bilges pertains to management of the ship and not to care and custody of the cargo. But in those cases the ship's officers were negligent in pumping water out of the bilges and the rising water damaged the cargo. Here we have a quite different case where the cargo flowed into the bilge through a break in the pipe and the consequent sticking of the non-return valve. This is lack of diligence in relation to the care and custody of the cargo and not mismanagement of the ship. The Vallescura, 293 U. S. 296, 303, 55 S.Ct. 194, 79 L.Ed. 373. See also Robinson on Admiralty, p. 515.

■ Finally, the shipowner calls attention to a provision in the bill of lading which reads: "that the carrier shall not be liable for loss or damage occasioned by * * * drainage or leakage." The contention advanced is that the ship was exempt from liability for loss of the oil by this contract provision unless the libelant has overcome it by affirmative proof on its part that the shipowner failed to exercise due diligence. That is to say, the burden of proof was on the libelant to show affirmatively absence of due diligence by the shipowner with respect to the loss of the oil. The Folmina, 212 U.S. 354, 29 S.Ct. 363, 53 L.Ed. 546, 15 Ann.Cas. 748. The contention is obviously untenable because the character of the loss in this case was not within the meaning of the contract provision. The oil was pumped overboard rather than lost by drainage or leakage; and the necessity for pumping it overboard was due to a defect in the ship and not to insufficient containers furnished by the shipper.

The libelant has contended that if the carrier is not fully liable for the loss, nevertheless the circumstances of the loss make a case for general average. In view of the conclusion reached that the carrier is fully liable for the loss, it is unnecessary to consider this contention about general average, nor is it advisable to do so because the contention is not set up in the pleadings, and the respondent claims surprise and has asked for further time and opportunity to meet the point if it is to be considered. The libelant has also requested permission to amend the libel to expressly cover the point, although contending the amendment is not necessary for its consideration.

The monetary damage to the libelant by the loss of the oil has not yet been established in evidence. Possibly the parties may be able to stipulate that amount without the necessity of further proof. But if there is no agreement as to the amount, counsel can at an early mutually convenient hearing submit the relevant evidence. If an interlocutory decree should be now desired, it may be submitted in due course.