## W. R. GRACE & CO. v. PANAMA R. CO.

### BLYTH, GREENE, JOURDAIN & CO., Inc., v. SAME.

(Circuit Court of Appeals, Second Circuit. November 13, 1922.)

### Nos. 66, 67.

1. **Shipping** ⊚⟹132(5)—**Evidence held to sustain conclusion vessel was unseaworthy at beginning of voyage.**

   Evidence that a vessel carrying an unusually large cargo of sugar began leaking during the voyage without encountering any unusual seas leads to the conclusion that the vessel was unseaworthy for the transportation of that cargo before the voyage commenced.

2. **Shipping** ⊚⟹132(4)—**Burden on owner to show exercise of due diligence to render vessel seaworthy.**

   Where the owner of a vessel seeks to avoid liability for damage to the cargo under a clause exempting him from liability for unseaworthiness of the vessel, if the owners have exercised due diligence to make her seaworthy, the burden was on the owner to show the exercise of due diligence.

3. **Shipping** ⊚⟹132(5)—**Evidence held not to sustain burden of showing diligence to render vessel seaworthy.**

   In a libel to recover damages to a cargo of sugar, injured by salt water when the vessel began leaking without encountering unusual seas, evidence as to the inspection of the vessel before the voyage, during which she attempted to carry an unusual load, and which was six months after she had been in dry dock, *held* insufficient to sustain the owner's burden of proving due diligence to render the vessel seaworthy before the voyage.

Appeal from the District Court of the United States for the Southern District of New York.

Separate libels in admiralty by W. R. Grace & Co. and by Blyth, Greene, Jourdain & Co., Inc., against the Panama Railroad Company, to recover damages because of seawater injury to shipments of sugar from Colon to New York City between May 4 and May 12, 1916. Decree for libelant in each case, and respondent appeals. Decrees affirmed.

The opinion of Learned Hand, District Judge, in the W. R. Grace & Co. Case, is as follows:

In this case the bill of lading contained the usual covenant against "unseaworthiness of the ship, even existing at the time of shipment or sailing on the voyage, provided the owners have exercised due diligence to make the ship seaworthy," and, as the sugar is shown to have been shipped in good condition and to have been discharged damaged, the burden is on the respondent to show the cause of the damage, The Folmina, 212 U. S. 354, 29 Sup. Ct. 363, 53 L. Ed. 546, 15 Ann. Cas. 748, and to establish either that the ship was seaworthy or that the owners had used due diligence to make her so. The Southwark, 191 U. S. 1, 24 Sup. Ct. 1, 48 L. Ed. 65; The Wildcroft, 201 U. S. 378, 26 Sup. Ct. 467, 50 L. Ed. 794.

When the ship reached New York, Ross, who must be reckoned a disinterested witness, found the fixtures generally in process of repair. All those on the starboard side, except one, had been repaired, and one had been taken away and sent to the shop. On the port side of No. 3, there were five, of which four were broken, either at the joint with the ship's side, or in the pipes, or both. Of these four, three had been leaking. On the port side of No. 5, there were three, of which one had a hole in the casting, apparently wasted through, and the other two had been leaking at the joint, while the pipe of one was broken. Only one of the breaks in the pipes showed signs of leaking; the

⊚⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

other leaks being in the joints at the ship's side. Ross' conclusion was that the cracks at the ship's side had broken by the ship's working on the voyage up, owing to the unusual draught, but that the breaks in the pipes were old.

The ship admitted only three leaks, one the hole in the casting, which was considered a blow hole, another a joint where the pipe met the casting, and the third a rubber gasket, which held tight a cover in the top of a casting. This is all the proof, and it does not prove that the three leaks admitted were the only ones. Assuming that the joints at the ship's sides were not broken when the ship left Colon, it does not follow that the ship was seaworthy in respect of them. She was loaded beyond her usual draught and her cargo was destructible by seawater. As she encountered no unusual weather on her way up, it seems to follow that, laden as she was, and with the cargo she carried, she was not in fact seaworthy. The Silvia, 171 U. S. 462, 464, 19 Sup. Ct. 7, 43 L. Ed. 241. The test of seaworthiness is relative to the cargo stowed and to the other circumstances of the proposed voyage.

Granting that no inspection would have shown any defects at the joints, I am not satisfied that due diligence would not have apprehended that some of them might work loose before she arrived. The evidence upon this simply does not exist, and some evidence should. It is said that nothing of the sort had occurred before, which is true; but no such voyage had been undertaken before, at least not for a long time. The ship's usual draught did not submerge the chests, except when the ship rolled, and the strain was much greater at the proposed draught. In the case of a cargo like sugar, I cannot say that the ship's record was enough to satisfy all doubts. After the leak developed in No. 3 on the voyage, holes were bored in the deck and the water drained off. This, coupled with ample dunnage, would have protected the sugar. It seems to me not beyond proper precaution, certainly it has not been shown to be.

Coming next to the leaks admitted by the ship, it is urged that, had any existed before, the inspection would have disclosed them. But this inspection was made presumably when the outlets were all above the water line. While it is true that with the rolling of the ship it is certain that they were repeatedly submerged upon the last voyage, a leak would show only in case it was large enough to make a trickle which, when dried, would show traces. It is not apparent to me that small leaks, only occasionally under water, would have done this. Perhaps they would, but I do not see how I can so find. In any case the respondent insists that inspection on the ship's skin was enough, and that any other was impossible, because the boxes prevented it. I cannot agree that the presence of the boxes was an excuse. It seems to me rather that there was no reason why the boxes should not have had hinged sides or doors in their sides, which would have offered ready means of inspection, and I hold that the ship is chargeable with whatever such inspection would have disclosed. In this I am requiring no more than was required in The Alvena (D. C.) 74 Fed. 252, affirmed 79 Fed. 973, 25 C. C. A. 261, and The Julia Luckenbach, 235 Fed. 390, 148 C. C. A. 650 and indeed less, because the floors in those cases were more troublesome to lift up and the cement to examine.

If the boxes had been so opened and the fixtures examined, what, then, would have been discovered? It is at least probable that the breaks in the pipes, of which there were five, would have appeared, because these breaks were old. Perhaps none of these contributed to the leaks, but probably at least one did. It might also have been discovered that the joints at the sides were in bad condition, though I have assumed that none were broken at the time. Possibly it is fairer to disregard these.

Of the three leaks admitted by the ship, the hole in the casting would not have been discovered, unless it had worn through. It is taken as conclusive that, had it worn through, a leak would have developed below the box encasing it. I agree that this is so, if the hole was as large as it was found to be at New York; but a small hole, not constantly under water, as this had not been, might not have shown a leak large enough to trickle down the ship's sides and leave a trace when dried. It seems to me somewhat of an assumption to say that the casting must have appeared sound, had it been examined.

As to the leak at the joint between the casting and the pipe, which Ross did not discover, because it was on the starboard side and had been presumably repaired, it seems to me quite impossible to say whether it would have been observable or not. Assuming that it had not yet broken through, how may one say that due diligence would not have shown that it was wearing? As in the case of the hole in the casting, a small leak might have remained undetected.

Finally, while I am willing to concede that the defect at the gasket probably would not have shown by mere inspection, it does not follow that the movable covers in the castings should not have been opened and the gasket looked at. This did not involve an undue amount of labor, and it is obvious that a sound gasket properly aligned would have served, because all the rest apparently did serve.

Hence it seems to me that, of the three leaks which the ship admits, at least two are not shown to have been outside the scope of reasonable diligence, and that the cracks in the pipes would almost certainly have been found. If, upon opening the boxes, all the fixtures would have appeared in bad condition in some parts, due diligence would have regarded this as a warning that they were being subjected to strains whose complete effect could necessarily not be ascertained. When it was proposed to subject them to greater strains than ever before, at least than they had endured since the ship had been overhauled in November, 1915, both because they were to be under water for a depth of two or three feet or more, and because the ship would work more heavily when deeply laden, some action should have been taken to avoid the consequent danger. As I have suggested, if nothing else was done, at least the cargo could have been protected.

In such cases the ship has the laboring oar, and must show that she could not reasonably have avoided the loss, and I think she has failed. I cannot think that under the circumstances it was sufficient precaution merely to look below the boxes and note that no leaks had as yet developed substantial enough to leave signs after the water had presumably dried. Had the whole fixtures been in apparently good condition, they could hardly have become so dilapidated in a single voyage, with no heavier weather than that encountered.

Perhaps I should say in closing that it seems to be established that the general overhauling in November, 1915, put these fixtures in good order. I do not mean that another overhauling was due at the time of this voyage. It does not seem to me, however, that after the space of six months it was safe to ignore such fixtures, boxed in as they were, and constantly subject to the twists and strains, due to the movements of the parts of a ship with relation to each other.

The libelant may take the usual interlocutory decree.

The opinion of Augustus N. Hand, District Judge, in the Blyth, Greene, Jourdain & Co., Limited, Case, is as follows:

I have carefully read the depositions, and do not find that the respondent has presented a better case than it did in answer to the previous libel filed by W. R. Grace & Co. The three leaks admitted by respondent were sufficient to explain the cargo damage, and no proof of adequate inspection has been offered. To be sure, the assistant engineer, McMullin, in his additional deposition, taken for this case, says that there were openings 18 inches square at the bottom of the sea-chest casings through which the pipes and joints could be examined. He says he made the usual examination, but when pinned down as to his personal knowledge says:

"Well, I am testifying from the point that it is my duty at each port, or before the holds are loaded, or after they were unloaded, to make this examination. My duties call for me to do that. Either I or the chief engineer—the chief engineer would usually make the inspection, or detail me to do it. Q. On this particular voyage, do you remember which of you made the inspection? A. No; I couldn't say that." Deposition of McMullin, Dec. 5, 1919, p. 9.

Matthews, the chief engineer, was examined on behalf of respondent on December 10, 1919, but was not asked whether he made any examination of

the sea-chests. It is evident that the testimony of McMullin goes only to the extent of showing a custom to inspect, and falls far short of proving any inspection at all, much less a thorough one, before the voyage in question, in which, from the depth of cargo, the vessel was certain to be subjected to an unusual strain.

It is true that, in the deposition of Pratt, the chief officer, which was used in the former trial, he testified that he inspected the condition of the scupper valves "as much as was possible on account of their being cased in," and found them "all right" (Deposition, p. 22); that he did this both before and after the load had brought them below the water line, and found no water trickling down. He also said (page 28) on cross-examination:

"Q. These fittings, through which the water leaked into the orlop deck, what do you call them? A. Sea-chests. * * * Q. Those were boxed in so that you couldn't see them when you went into the hold, is that correct? A. I couldn't see the essential parts of it, but I could see the pipe that led to and from it. Q. But you could not see the sea-chests themselves? A. No; they are kept boxed in, so the cargo won't break them."

It is quite possible that there might have been defects visible on a careful inspection which would not be sufficient to cause a leak at the precise time of inspection. It is even conceivable that the hole in the casting on the port side of No. 5 hold might then have worn through sufficiently to be visible, and yet not to cause a leak which would be apparent to a superficial view. The worn joint between the casting and the pipe, as well as the gasket which proved leaky, might, by careful scrutiny, have been found defective. When the ship was to be laden with an unusual cargo, and hereby subjected to an extra strain, a most careful inspection should have been had. The evidence shows no more than a casual examination, if even as much as that. It does not indicate the method of inspection or the means used for penetrating the deck recesses of the boxed sea-chests, and, in short, does not establish the proper care which the ship owed to the cargo. Perhaps a vessel loaded as she was would not have shown a leak until subjected to the buffeting of the sea.

I am quite convinced, however, that three separate leaks in different sea-chest fixtures could hardly have occurred during a voyage where no unusual weather was encountered, if due diligence had been used to render the vessel seaworthy, and I shall grant a decree with costs to the libelant accordingly.

Richard Reid Rogers, of New York City, for appellant.

Bigham, Englar & Jones, of New York City (Henry N. Longley, of New York City, of counsel), for appellee W. R. Grace & Co., Inc.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (Robert S. Erskine and Harry D. Thirkield, both of New York City, of counsel), for appellee Blyth, Greene, Jourdain & Co., Inc.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

MAYER, Circuit Judge. These two appeals will be disposed of in one opinion, as they arise out of the same voyage, on the same state of facts, and, while there is some additional testimony in the Blyth Case, it added nothing of evidentiary value to that adduced in the Grace Case.

Both Judges Learned Hand and Augustus N. Hand carefully discussed the facts in their opinions, and we accept the facts as found by them. The sole issue here is whether or not appellant has successfully established a defense under the following clause of the bill of lading:

"No carrier * * * shall be liable * * * for unseaworthiness of the ship, even existing at the time of shipment or sailing on the voyage, provided the owners have exercised due diligence to make vessel seaworthy."

285 F.—46

[1] The evidence clearly leads to the conclusion that the vessel was unseaworthy before the voyage commenced. The Warren Adams, 74 Fed. 413, 20 C. C. A. 486.

[2] The burden of proof was upon appellant to show the exercise of due diligence. The Southwark, 191 U. S. 1, 24 Sup. Ct. 1, 48 L. Ed. 65; The Wildcroft, 201 U. S. 378, 26 Sup. Ct. 467, 50 L. Ed. 794; The Folmina, 212 U. S. 354, 29 Sup. Ct. 363, 53 L. Ed. 546, 15 Ann. Cas. 748; The Friesland (D. C.) 104 Fed. 99. So far as the testimony discloses, there was not any latent defect, so that liability, if any, under that head, need not be discussed.

[3] Appellant admitted three leaks in the vessel, and there was evidence of other leaks. Ross, a naval architect, engineer, and surveyor, who was regarded by Judge Learned Hand as a disinterested witness, testified that, in his opinion, most of the water came through the joints at the side of the ship. Confining the inquiry to the admitted leaks, and eliminating one defect which might not have been discovered by inspection, it appears that the sea valves were covered by boxes. Such inspection as was made did not include the very easy task of taking off the boxes and examining the valves before the voyage was commenced. The vessel had been in dry dock the previous October, and, assuming that they were seaworthy six or seven months prior to the voyage, that fact does not justify the failure to remove the boxes for purposes of inspection. The burden is not on appellee to show that inspection of the sea valves before commencing the voyage would have disclosed defects. On the contrary, it cannot be said that, if the boxes had been removed and then the valves inspected, it would not have been apparent that the defective conditions which caused the leakage existed.

A sugar cargo is readily susceptible to water damage, the ship, as found by both District Judges, was to be subjected to greater strains than usual, and, in brief, all the circumstances required an inspection of the boxes to meet the test of due diligence. As well put by Judge Learned Hand, in the Grace Case:

"In such cases the ship has the laboring oar, and must show that she could not reasonably have avoided the loss, and I think she has failed. I cannot think that under the circumstances it was sufficient precaution merely to look below the boxes and note that no leaks had as yet developed substantial enough to leave signs after the water had presumably dried. Had the whole fixtures been in apparently good condition, they could hardly have become so dilapitated in a single voyage, with no heavier weather than that encountered. * * * It does not seem to me, however, that after the space of six months [after dry dock] it was safe to ignore such fixtures, boxed in as they were, and constantly subject to the twists and strains, due to the movements of the parts of a ship with relation to each other."

See The Alvena (D. C.) 74 Fed. 252, and 79 Fed. 973, 25 C. C. A. 261.

Decrees affirmed, with costs.