## WARNER SUGAR REFINING CO. v. MUNSON S. S. LINE.

## MUNSON S. S. LINE v. WARNER SUGAR REFINING CO.

District Court, S. D. New York. July 22, 1927.

1. Shipping &#9758;53—Harter Act may be made by reference part of charter (46 USCA §§ 190–195).

A ship carrying a full cargo for the charterer is not a common carrier, and the Harter Act (46 USCA §§ 190–195 [Comp. St. §§ 8029–8035]) does not apply of its own force; but the parties by express reference may make it part of the contract.

2. Shipping &#9758;141(1)—Due diligence held essential to exempt owner from liability for damage from unseaworthiness under provisions of contract.

Under the provisions of a contract of carriage, charter party, and bill of lading, owner, to be entitled to exemption from liability for damage to cargo resulting from unseaworthiness, *held* required to show due diligence to make the ship seaworthy at the beginning of the voyage.

3. Shipping &#9758;141(4)—Inspection held not such as to relieve owner from liability for damage resulting from broken water pipe.

Testimony that, before commencement of a voyage, one of the officers of the vessel went through the holds and saw that there were no leaks in the pipes, but no further examination or tests were made, *held* not sufficient to exonerate the owner from liability for damage to cargo caused by leakage from a broken water pipe, not accounted for by unusual weather conditions.

In Admiralty. Suit by the Warner Sugar Refining Company against the Munson Steamship Line, with cross-libel. Decree in accordance with opinion.

Bigham, Englar & Jones and Roger H. Loughran, all of New York City, for libelant.

Kirlin, Woolsey, Campbell, Hickox & Keating, L. de Grove Potter, and Earl Appleman, all of New York City, for respondent.

GODDARD, District Judge. Libel filed by the Warner Sugar Refining Company against the Munson Steamship Line for alleged damage to a part of a full and complete cargo, consisting of 20,880 bags of sugar, shipped at Antilla, Cuba, on March 29, 1924, for New York, on the steamship Munamar, operated by the Munson Steamship Line. Cross-libel filed by the Munson Steamship Line against the Warner Sugar Refining Company for unpaid freight on the cargo.

In January, 1924, the Warner Sugar Refining Company and the Munson Steamship Line entered into a contract by which the Warner Sugar Refining Company agreed to ship all the raw sugar manufactured by certain firms in Cuba during the season of 1924 on the Munson Line steamers, and under which contract the Munson Steamship Line agreed to provide steamers to carry the sugar in full cargo lots. After providing for the payment of freight, demurrage, and other matters which are not in controversy here, the contract continued as follows:

"Eighth. All other conditions, in so far as freighting is concerned, shall be in accordance with the attached charter party form under which said sugar shall be freighted; and to the extent that the said charter party form in its terms and provisions does not conflict with the clauses of this contract, same is deemed hereby incorporated in and made a part of this contract.

"Ninth. No claims shall be made by either of the parties hereto against the other by reason of any failure to fulfill any obligation herein, which failure is occasioned by any or either of the following causes, to wit: Act

of God, adverse winds, perils of the sea, danger or accidents of steamer or other navigation, restraint of princes and rulers, public enemies, fire, lightning, earthquake, wind, pestilence, explosion or mob violence, crop failure, revolutions, pirates, accidents to machinery or boilers, or by strikes or general labor troubles, latent or other defect in hull, machinery, or appurtenances, or unseaworthiness of the vessel or any craft, provided due diligence shall have been exercised to make the same seaworthy. * * * Nothing herein contained, however, shall be deemed to limit the bill of lading provisions which shall apply after the steamship company becomes responsible for the cargo. * * * "

The charter party included the following pertinent provisions:

"First. The said vessel shall · be tight, staunch, strong, and in every way fitted for such a voyage, except as hereinafter provided as to seaworthiness and latent defects, and shall receive on board during the aforesaid voyage the merchandise hereinafter mentioned.

"Second. The act of God, adverse winds, restraint of princes, rulers and people, enemies, war of any nation affecting this charter party, requisition by any power, fire, pirates, accidents to machinery or boilers, collisions, errors of navigation, and all other dangers and accidents of the seas, rivers and navigation of whatever nature and kind soever, even when occasioned by negligence, default or error in judgment of the pilot, master or mariners, during the said voyage, are always mutually excepted. * * *

"Fifth. Bills of lading on approved form shall be signed without prejudice to this charter, and subject to this contract as to freight, dead freight, and all other conditions, including loading, discharging, demurrage and despatch. * * * "

"Seventh. It is mutually agreed that this charter is subject to all the terms and conditions of and all the exemptions from liability contained in the act of Congress of the United States entitled 'An act relating to the navigation of vessels, etc.,' approved on the 13th day of February, 1893. And the party of the first part shall be entitled to all the exemptions from and limitation of liability provided for in sections 5281–5289 of the United States Revised Statutes [18 USCA §§ 21–28] and in the statutes amendatory thereof and supplemental thereto, as if actual owner of vessel. Seaworthiness warranted only so far as ordinary care can provide, and owners are not liable for loss, detention, or damage arising from latent defects existing at the time of sailing. * * * "

The bill of lading, which is incorporated by reference in the sugar contract, provided:

"2. It is also mutually agreed that the carrier shall not be liable either as carrier, bailee, or otherwise, for any loss, damage, default or delay in shipment, transportation, delivery or otherwise, wheresoever occurring, occasioned at any stage of the adventure by fire or explosion from any cause; by quarantine; by wars, hostilities, rebellions, or civil commotions; by giving way, falling, or destruction of wharf, shed, or warehouse; by barratry of the master or crew; by acts of persons not in the employ of the carrier; by causes beyond the carrier's control, perils of the sea, or other waters, act of God, enemies, pirates, robbers or thieves, whether in the employ of the shipowner or carrier, or not; by arrest or restraint of princes, rulers, or peoples; by riot, strikes, or stoppage of labor; by explosion, bursting of boilers, breakage of shafts, any latent defect in hull, machinery, or appurtenances, or unseaworthiness, either of the ship or of any craft or lighter, whether existing at time of shipment or at the beginning of the voyage, collision, stranding, or any other accident of navigation of whatsoever nature or kind: Provided the owners have exercised due diligence to make the ship seaworthy. * * * "

"5. It is also mutually agreed that this shipment is subject to all the terms and provisions of and all the exemptions from liability contained in the act of Congress of the United States approved on the 13th day of February, 1893, and entitled 'An act relating to the navigation of vessels,' etc., and anything contained herein repugnant thereto is hereby waived. The carrier does not hereby waive any of the exemptions from liability contained in any statute or statutes, or other rules of law, which may be applicable."

The Munamar was a steel vessel, 367 feet long, built in 1915, and was equipped as an oil burner; she had four cargo holds and four main deck hatches. The engine room was located between Nos. 2 and 3 hatches, and there were cross-bunker spaces on either side of the engine room, which, as the ship was an oil burner, were used for carriage of cargo. At each end of the bunker spaces were doors leading into adjoining cargo compartments. Upon the discharge of the steamer after her arrival at destination, it was found that sugar in Nos. 2 and 3 compartments in both 'tween decks and the holds had been damaged by water, and there were indications of wetting in the port and starboard bunker spaces. The doors constructed to give access from 'tween deck spaces and bunker spaces, and which, it was testified,

were supposed to be closed water-tight while at sea, were open and ajar. And the chief officer testified that during the voyage water had run over the door sill into the bunker space, and through it and out into No. 3 'tween deck.

It also appears that there was an iron pipe, about one inch in diameter, leading up from the fresh water tank, in the engine room through the main deck on the port side, somewhat aft of the No. 2 hatch coaming, for the purpose of supplying drinking water, etc., to the crew, and was constantly under pressure, so as to provide a flow of water to the faucet of the pipe, which was about 4 feet above the deck. The pipe was fastened with a bolted bracket where it passed through the deck. The testimony of the Munamar's witnesses is that this pipe was broken off at the deck by the heavy seas during the heavy weather on the night of April 1st, and as the decks were awash, and as the breaking of the pipe left a hole in the deck about an inch in diamater, and as the water continued to flow from the pipe, a considerable quantity of fresh and salt water ran down into the hold and found its way into the other compartments where the damaged sugar was found; that the water ran aft through the cargo door into the bunker space on the port side, in which some of the sugar was stored, and also through another cargo door in the afterpart of the bunker space into No. 3 'tween deck compartment, and wet the sugar, and that the broken pipe was not discovered until the following morning, because of the darkness and danger incident to being on deck during the heavy weather. They also testified that some other deck fittings and a portion of a ventilator under the topgallant forecastle were carried away. However, the ship's log made no mention of any damage, except to the pipe.

The weather from March 29th, when the Munamar left Antilla, until April 1st, was fair, light winds, calm sea. From that time until her arrival at Ambrose Channel, at 8:15 on the morning of April 2d, the entries in the Munamar's log relating to the weather are "a strong breeze;" "moderate gales;" "strong gale;" "rough seas;" "chipping heavy seas over vessel;" "taking spray over decks." The master, however, testified that late in the evening of April 1st "* * * the wind had been to the eastward, and it came up northwest, north and west, and blew a living gale for a long while, squalls and hurricane force at times, water coming over the ship at times and washing things away." The chief officer testified they had fine weather until the last night before they reached Ambrose Chan-

nel, when "* * * it started in blowing hard, had a gale of wind, squalls; we had heavier intensity at times taking seas over the decks; the decks were awash all night." The chief officer also testified that, before the cargo was loaded, he looked through all of the holds to see that the ports were tight, and that there were no leaking pipes, and that the scuppers were clear; that he did not go around tapping or hammering; that he just looked around to see if they were leaking.

In answer to the following questions, the chief officer replied:

"Q. How, did the water get from No. 2 'tween deck into the port bunker and No. 3? A. There is a door in the forward end of the bunker and leading into 3, and a door in the after end into 3; you can walk, and the doors are not water-tight; the sill is about 6 or 8 inches high; it runs over that and into the bunker; we have scuppers in the 'tween deck, but they get plugged up.

"Q. How did the water get from the port bunker space into the No. 3 'tween deck? A. The same way; it went over this thing 6 or 8 inches high, and it went up into No. 3."

The Munson Steamship Line claimed freight amounting to $10,285.89, of which it has been paid $5,748.58; the balance of $4,537.31 was admittedly withheld by the Warner Sugar Refining Company to cover its alleged damage to the sugar.

The Munson Steamship Line, in its amended answer, denies that it was acting on this voyage as a common carrier, and sets up a contract of special carriage, which it alleged with the bill of lading constituted the contract of carriage and contained certain exemptions, which it pleaded as defense.

[1] The charter party now under consideration gave the charterer the full capacity of the ship Munamar and as such it was not a common carrier, and the Harter Act (27 Stat. 445 [46 USCA §§ 190–195; Comp. St. §§ 8029–8035]) would not of its own force have applied, but the contracting parties have expressly made it a part of their contract, which they were at liberty to do. The G. R. Crowe (C. C. A.) 294 F. 506. Therefore, in order for the Munson Steamship Line to clear itself from liability for damage to the sugar, it must show that it used due diligence to make the vessel seaworthy, provided in the Harter Act, §§ 1 and 2 (46 USCA § 190, 191 [Comp. St. §§ 8029, 8030]).

[2] The Munson Steamship Line urges that it has not pleaded and attempted to take advantage of the Harter Act as a defense, and that it relies solely on the stipulation in the contract by which it is exempted from loss or

damage due to wetting, perils of the sea, etc. However, the Warner Sugar Refining Company has the right to rely upon all the terms of the agreement entered into, and the provisions of the Harter Act have been expressly incorporated in the charter party, paragraph 7, and in the bill of lading, paragraph 6. It is also to be noted that the contract of carriage itself stated (paragraph ninth, quoted above): "Nothing herein contained, however, shall be deemed to limit the bill of lading provisions which shall comply after the steamship becomes responsible for the cargo." And further, that paragraph 2 of the bill of lading, after mentioning a list of conditions for which the shipowner shall not be liable, including unseaworthiness, states: "Provided the owners have exercised due diligence to make the ship seaworthy."

It is evident, therefore, from reading "the contract of carriage, charter party, and bill of lading," that it was the intention of the parties that the exemptions from liability were dependent upon the condition that the shipowner used due diligence to make the ship seaworthy. Therefore it seems clear that the question to be determined is whether the breaking of the pipe and the wetting of the sugar were occasioned by the failure of the shipowner to exercise due diligence. The Cornelia (D. C.) 15 F.(2d) 245, 1926 A. M. C. 1337.

[3] Specifically, the question in the case at bar is whether the shipowners exercised proper care to see that this water pipe, which broke and allowed water to run down into the hold and flow into the several compartments where the sugar was, and to congregate there because the scuppers were clogged, was in good condition when the sugar was taken aboard. This record fails to show that they had made a very diligent effort in this respect. The only testimony as to the condition of the pipe at that time was that of the first officer, who testified that before taking on cargo he looked through all the holds and saw that there was no leaks in the pipes; that he made no other tests or examinations. There is no information as to the age of the pipe, whether it was eaten with rust, or what its actual condition was. This falls far short of convincing one that the pipe was in sound condition. Practically all that his testimony amounted to in this respect was that the pipe was not leaking at that time.

If a vessel owner is satisfied to rely on external appearances that the vessel and her appliances are in such good order that it is safe to take cargo on board, instead of making fair examinations and tests, the vessel owner assumes the responsibility for such defects as may exist and which a diligent examination would reveal. And a shipowner has not sustained the burden of exercising due diligence by a mere superficial inspection; nor where the inspection or the evidence is insufficient to support a finding of good condition, or that a diligent effort had been made to put her in good condition. The Southwark, 191 U. S. 1, 24 S. Ct. 1, 48 L. Ed. 65; The Wildcroft, 201 U. S. 378, 26 S. Ct. 467, 50 L. Ed. 794; The Charlton Hall (D. C.) 285 F. 640; The Leerdam (D. C.) 8 F.(2d) 295, affirmed (C. C. A.) 17 F.(2d) 586, 1927 A. M. C. 509.

The Munson Steamship Line, in support of its contention that the pipe broke, not because it was weak, but because extraordinarily heavy weather was met with, refers to the testimony of its witnesses that certain other deck fittings, including a portion of a ventilator, were torn off, although it is to be noted that these other items were not mentioned in the Munamar's log; but, even if they were, this may indicate that they, too, were weak and in poor condition, for all that the record shows. The evidence does not indicate weather conditions sufficiently severe or extraordinary to break a sound and properly installed pipe.

Neither the log nor the testimony of the master or the chief officer states the velocity of the wind; the master, however, characterized it "a living gale, * * * squalls and hurricane force at times." In view of the entries in the log and all the other circumstances, I think he has probably unduly emphasized the severity of the weather, and that the Munamar met with nothing more than heavy winds and seas, which an able ship should be prepared to withstand.

Although I am inclined to accept the log as more correctly reflecting the real condition of the weather than the testimony of the master and the chief officer, even their testimony is not convincing that the Munamar "met with any storm of that extreme violence which has long been counted as excusing peril of the sea for a ship thoroughly seaworthy and properly equipped and well found," quoting from Judge Hough's opinion in The Edith (C. C. A.) 10 F.(2d) 684, where the testimony was of strong easterly gales, with seas washing heavily over the ship, and wind estimated at 75 miles an hour, and described by the master as one of the worst storms in his experience. See, also, Governor Powers (D. C.) 243 F. 961; The Edwin I. Morrison, 153 U. S. 199, 14 S. Ct. 823, 38 L. Ed. 688; The Rosalia (C C. A.)

264 F. 285; The Giulia (C. C. A.) 218 F. 744.

For the above reasons, it is unnecessary to consider whether diligence had been used to keep the scuppers clear, so that water would not congregate in the bunkers, where the sugar was stowed, and, of course, proof is lacking that breaking of the pipe was due to a latent defect.

Accordingly the cross-libelant and respondent, the Munson Steamship Line, may have an interlocutory decree against the libelant and cross-respondent, Warner Sugar Refining Company, for such freight as may be due on the cargo, less the amount of damage sustained to its shipment of sugar, with a reference to a commissioner to determine the amount of freight due and the amount of the damage.

---

## THE H. A. ROCK.

District Court, W. D. New York. November 2, 1927.

**1. Shipping ⊸101—Ship, whose entire cargo was shipped by one shipper to certain mill and elevator corporation, was private carrier.**

Ship, whose entire cargo was, according to bill of lading, shipped by one shipper to order of certain mill and elevator corporation, was private carrier.

**2. Shipping ⊸141(3)—Winds not amounting to storm on Lake Michigan and ice field on Lake Erie held not "peril of the sea."**

Fresh winds not amounting to storm on Lake Michigan and ice field on Lake Erie *held* not peril of sea, which would excuse broken water pipe on ship; "peril of the sea" being storm or condition catastrophic in character.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Perils of the Sea.]

**3. Shipping ⊸132(5)—Evidence held insufficient to show that breaking of water pipe on ship, which damaged cargo, was due to negligent navigation through ice field.**

Breaking of water pipe on ship, resulting in damage to cargo, *held* not due to negligent navigation of ship by master through ice field in Lake Erie, in view of evidence, where master did what all other ship captains, of which there were 40 or 50 in vicinity, were doing.

**4. Shipping ⊸121(1)—In every contract for carriage of goods by sea, unless otherwise stipulated, there is warranty that ship is seaworthy at beginning of voyage.**

**5. Shipping ⊸132(5⅓)—Evidence held not to show sufficient inspection of ship before sailing to determine seaworthiness, in view of method of inspecting pipe which broke.**

Evidence *held* not to show that due diligence was used to inspect ship prior to sailing to determine seaworthiness, where pipe which broke during voyage, damaging cargo, was not tapped with hammer or otherwise to determine soundness.

**6. Shipping ⊸132(3)—In action for damage to cargo from broken pipe, shipowner must show that due diligence was used to make vessel seaworthy before voyage.**

In action against shipowner for damage to cargo by breaking of pipe during voyage, burden of proving that due diligence had been used to make vessel seaworthy before voyage is on shipowner.

**7. Shipping ⊸111—Purchaser of grain, to whom bill of lading was indorsed and delivered, is proper party to sue for subsequent damage to cargo.**

One who bought grain, and to whom bill of lading was indorsed and delivered, became owner of cargo, and was proper party to bring suit for subsequent damage.

In Admiralty. Libel by the Eastern Grain Mill & Elevator Corporation against the steamer H. A. Rock, her engines, boilers, etc.; the Forest City Steamship Company, claimant. Decree for libelant.

Holding, Duncan & Leckie, of Cleveland, Ohio, for libelant.

Kelley, David & Cottrell, of Cleveland, Ohio, and Single & Single, of New York City (Forrest E. Single, of New York City, of counsel), for respondent.