## THE ANACONDA.

## GOLD DUST CORPORATION v. UNITED STATES.

### No. 413.

Circuit Court of Appeals, Second Circuit.
Aug. 23, 1932.

It is well known that oil is more difficult to hold in any container than water because it is very thin and will pass through much smaller openings. Moreover, small leaks in a water tank may be stopped or minimized by the formation of rust, but a tank of oil, which tends to dissolve rust, possesses no such corrective possibilities. Because of the dangers inherent in such a cargo, it is important and customary to test a tank, which is to be loaded with oil, by filling it with water and subjecting it to pressure. By means of such a hydraulic test, the places where the tank may leak because of rivets that have loosened or rusted away, or because of other defects, can ordinarily be discovered. These tests were made in No. 2 and No. 4 tanks before the oil was loaded at Rotterdam for New York. No leak was discovered then or at any time afterward in No. 4 tank. When the pressure was applied to No. 2 tank, a leak was detected in the air vent pipe on the after port side just where it entered the tank. The pressure was then pumped off that side of the tank, the leaky vent pipe was repaired, the tank was then pressed again to prove that it was tight, and, as respondent contends, no leak showed itself.

If the defects in the tank should thereafter develop and sea water should get into it through the external pressure of the outside column of water on the tank, which was 16 feet below the surface of the sea, the oil, being of less specific gravity than water, would come against the top of the tank, and, if the tank top leaked, would to some extent flow out and be lost. This is probably what happened. So far as the effects of the hydraulic test on No. 2 tank were fully observed, they would show whether the tank top leaked or not. But, during the test which was made to this tank, the top was only partly exposed to view. Boards in the ceiling, above and close to the top, were lifted along the whole length of the tank on both the port and starboard side, at a distance of some two or three feet from the skin of the ship. Boards were also lifted here and there at other places, but the ceiling was not generally uncovered.

The respondent contends that enough was done to detect leaks in No. 2 tank. Yet, on the arrival after a voyage in which the vessel had experienced ordinary weather, leaks had developed in the tank top of No. 2 and elsewhere in the tank to such an extent that the oil was contaminated with sea water and a considerable amount of it was lost. A survey was held after the oil was discharged at Philadelphia. It is apparent from the sur-

Howard W. Ameli, U. S. Atty., of Brooklyn, N. Y. (William E. Collins, Sp. Asst. to U. S. Atty., of New York City, of counsel), for appellant.

Bigham, Englar, Jones & Houston, of New York City (Oscar R. Houston and James N. Senecal, both of New York City, of counsel), for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The steamship Anaconda, belonging to the United States, took on a cargo of 600 tons of linseed oil in Rotterdam, all in good order and condition. When she arrived at New York, the oil in No. 2 tank was short and contaminated with water and the cargo in No. 4 tank was contaminated. The vessel suffered no such bad weather that the damage could be attributed to perils of the sea. The only serious defense is based on the provisions of the bill of lading that the carrier should not be liable for latent defects if due diligence was exercised to make the ship seaworthy. The court below found that the oil in both tanks was damaged through the fault of the respondent, and, from the decree awarding damages, respondent appeals.

Neither tank No. 2 nor tank No. 4 had ever carried oil before the voyage in question.

vey, and is conceded in respondent's brief before us, that oil in tank No. 2 escaped through leaks in the tank and that sea water entered. The situation is described in the brief as follows: "* * * Leaks were * * * discovered in the tank top, consisting of a 9 ft. seam near the center, certain rivets in the starboard after end of the hold in the angle irons connecting the tank top, and a further leak in a union of the vent pipe situated about 3 ft. above the tank top (fols. 150–1, 214–216, pp. 329–331). It was also evident from the sea water which had been found in the oil that the shell of the tank was leaking (fol. 990)."

It is to be observed that the examination, under hydraulic pressure, made at Philadelphia, after the tank had leaked on the voyage from Rotterdam, involved a substantial removal of the ceiling of No. 2 tank in order to secure full inspection. This is what two of the experts, Waeber and Holmes, testified ought to have been done when the tank was tested at Rotterdam, and such an exacting standard of care the trial court applied. There is some question whether No. 2 tank was pressed up after the repairs to the vent pipe had been made. Respondent offered testimony that this was done, but libelants say that the proof of a second hydraulic pressure was insufficient, and so the trial court held. But, irrespective of this, we are inclined to the opinion that, when oil is carried in a tank, at least when it is carried there for the first time, the test should be conducted in such a way as to afford a more complete view of the tank top than was had in the present case. Apparently the ceiling was right on the tank top. Fol. 865. Consequently the ceiling should have been practically removed, so as to give those making the test a view of the entire top, or strips should have been taken up at some point or points to which the water from any leak would be sure to flow after having due regard for the list of the ship to port. The proof does not make it clear that either course was adopted during the test at Rotterdam. In the case of the starboard tank of No. 2, no one can say that a leak which started near the longitudinal bulkhead, that separated the starboard from the port tank, could have been discovered. The same thing would be true of any leaks in the port tank which were close to the skin of the ship. Moreover there were battens under the ceiling which impeded drainage (fol. 169), and so might have prevented the discovery of any leaks which were covered by the ceiling in either the starboard or port tanks.

▪ We agree with the trial court that the inspection of tank top No. 2 was not adequate in view of the character of the cargo to be taken on board and that there was not due diligence shown to render this tank seaworthy. The leakage directly caused the loss of the oil and also facilitated the admission of sea water which would have had little chance of entering if the tank, that was substantially full, had also had a tight top.

▪ The oil in tank No. 4 was contaminated. It smelled slightly of bilge water, so that the odor is found to have lessened its value by $2,205.37. But it was uncontaminated and sweet when shipped at Rotterdam, and the tank in which it was loaded neither then nor at the end of the voyage had any leaks. Consequently no water could have percolated into the oil. In such circumstances the exception in the bill of lading against liability for contamination protects the ship unless there is proof of negligence on her part. Clark v. Barnwell, 12 How. at page 279, 13 L. Ed. 985; The Milwaukee Bridge (C. C. A.) 26 F.(2d) 327, at page 329; The Florinda (C. C. A.) 31 F.(2d) 262, at page 264; The Isla de Panay (C. C. A.) 292 F. 723, at page 728.

It may be argued that, if clean and odorless oil is placed in a sealed tank it will not take on a smell of bilge water unless the tank contained bilge water when loaded, and that, if it did, the ship was at fault for improper cleaning. In other words, it may be said that the circumstances themselves indicate negligence, and that the ship must come forward with some explanation.

The tank had carried sea water as ballast on a previous voyage, and at the pier at Rotterdam had been filled with water for a hydraulic test. But after the test was made the tank was pumped out and cleaned by a large force of workmen who scraped off with hand scrapers any dirt that was in it and sopped up with sponges and rags any water that had not been drawn out by the pumps. Stewart, the chief engineer of the Anaconda, testified in detail as to the method of cleaning, and said that, after it was completed, he and Swart, who represented the underwriters, inspected the tank carefully and found it free from water and entirely dry. It was undoubtedly prepared for cargo under the constant supervision of Swart, and was put in a condition satisfactory to him. The testimony of Jensen, the chief officer of the ship, Smith, the port engineer of the Fleet Corporation at Rotterdam, and Savenije, the rep-

resentative there of the American Bureau of Shipping, indicates that tank No. 4 was tight, clean, and dry before receiving the oil.

■ If, after this cleaning, some slight odor remained, it probably was unavoidable. At all events we cannot say that there was lack of due diligence to make the tank seaworthy or that the cleaning was not conducted properly. As negligence has not been shown, the ship may invoke the exception in the bill of lading against liability for contamination, so that the recovery of $2,205.37 for the oil in tank No. 4 cannot stand.

■ There is much contention as to the proper mode of fixing the loss of libelant on the oil in tank No. 2. Respondent insists that Getchell, on whose testimony the commissioner made his findings as to this damage, was not a properly qualified witness. But Getchell for eight years had been superintendent of the Archer-Daniels-Midland Company, a large refiner of oil. He had before him the chemical analysis of the oil, and was familiar with cost of reconditioning contaminated oil and with market conditions. While he was not in charge of sales for his company, he was in a position to make a fair appraisal. He estimated the value of the contents of tank No. 2 at 59 cents per gallon, as against a sound value of 96 cents. But, in computing the value of the depreciated oil delivered to the consignee, the commissioner multiplied by 59 cents the number of gallons of pure oil shipped instead of multiplying by 59 cents the number of gallons of mixed oil and water on which the estimated value of 59 cents per gallon had been based. This theory of calculation was erroneous.

The quantity of sound oil shipped in tank No. 2 less tare was 87,940.738 gallons, but the mixed oil and water which respondent claims were delivered amounted to 91,438.96 gallons. Under the method of calculation of the commissioner, respondent was deprived of a credit of 59 cents per gallon on the number of gallons by which this contaminated oil delivered exceeded the sound oil shipped. If 91,438.96 had been the number of gallons of contaminated oil taken from tank No. 2, the error in the calculation of the master would justify a reduction of the damages awarded for the oil in tank No. 2. But 91,438.96 was not the correct amount of contaminated oil in that tank because the 91,438.96 gallons represented all the oil delivered by the Teddy Burke, and included not only the oil from tank No. 2, but likewise a small amount from tank No. 4. The amount of oil carried by the Teddy

Burke which came from tank No. 4 may be computed as follows:

| | | |
|---|---|---|
| Oil shipped at Rotterdam in tank No. 4 (fol. 1931) | 88,211.63 gal. | |
| Allowance for tare at one-fourth of 1 per cent. | 220.53 | |
| Net amount shipped in tank No. 4 | 87,991.10 | |
| Oil left in tank No. 4 and never delivered | 4,152.13 gal. | |
| Oil delivered by tug Seneca (all being from tank No. 4) | 80,380. | 84,532.13 |
| Balance | | 3,458.97 gal. |

The item 3,458.97 represents the oil which must have been pumped into the Teddy Burke from tank No. 4, and it should be deducted from the above 91,438.96 gallons in order to determine the amount of contaminated oil delivered to the consignee from tank No. 2. After this deduction, the net amount delivered from tank No. 2 would be 87,979.99 gallons. If this be valued at 59 cents per gallon, the damages to the shipment in tank No. 2 may be computed as follows:

| | | |
|---|---|---|
| Quantity shipped in No. 2 tank at Rotterdam | 88,161.138 gal. | |
| Less tare of one-fourth of 1 per cent. | 220.400 | |
| | 87,940.738 gal. | |
| Steamship Anaconda received 87,940.738 gallons of the value, at 96 cents per gallon, of | | $84,423.11 |
| Steamship Anaconda delivered to Teddy Burke 87,979.99 gallons of the value, at 59 cents per gallon, of | | 51,908.19 |
| Loss on oil shipped in tank No. 2 equals | | $32,514.92 |

The commissioner allowed $32,614.37 for loss on this shipment, or only $104.45 more than the above figure of $32,514.92. Though the commissioner used a wrong multiple in computing the value of oil in tank No. 2, his error made almost no difference in the result, for his multiple was 88,161.136 gallons (fol. 1978, 1979), while the one we have used is 87,979.99, which is not much less. If the correct multiple had been 91,438.96 gallons, as claimed by respondent, instead of that number less 3,458.95 gallons taken from tank No. 4, the erroneous theory of computation adopted by the commissioner would have resulted in increasing the claim against the respondent by approximately $2,140.25. But the multiple he in fact used was little greater than the number of gallons of contaminated oil actually delivered from tank No. 2.

Upon the record, the amount of recovery allowed for the oil shipped in No. 2 tank should not be diminished by $104.45. In calculating the loss at $32,514.92, supra, we

902

have ignored the fact that the valuation of 59 cents was based upon a sample taken from the Teddy Burke with whose oil taken from No. 2 the 3,458.97 gallons taken from No. 4 had been mingled. Had the sample been taken simply from No. 2, its quality would have been inferior to the sample actually used. Therefore respondent, under our calculation, has received slightly more credit than it deserves. Moreover, we have deducted from the original shipment of oil in No. 2 tank 220.4 gallons as tare. We have also deducted 220.53 gallons as tare in calculating the original shipment of oil in No. 4. This we did so as to follow the reasoning of respondent's counsel and to compare the results with the finding of the commissioner. But tare was not allowed by the commissioner, no exceptions were filed to his report for failure to allow it, and we find nothing in the record to show that such an allowance ought to be made. If we had not made it, the damages of the oil in tank No. 2 would have been increased by $341.68. Under the circumstances, the damages of $32,619.37 allowed by the commissioner should stand.

The commissioner allowed libelant six days' demurrage at $150 per day because the barge Teddy Burke was delayed at the customs due to the condition of the oil on this barge. The evidence does not support such an allowance. Ferguson said she was laid up "four or five days * * * some period between that and a week. * * *" Four days' demurrage (that is $600, instead of $900) is the most that should be allowed upon such vague testimony. The commissioner also allowed five days' hire of the barge Seneca at $200 per day. She was employed in order to transport the oil from tank No. 4 so that it should not be mixed with the contaminated oil from tank No. 2. But there is no explanation for her being kept on hire for five days, nor is there any sufficient showing that delay was necessary in securing entry at the customs for the comparatively good oil which she carried. This item of $1,000 should be reduced to $400. If more than two days' hire was required, this should have been proved. The item of $100 for towage was properly allowed.

The decree is modified by disallowing the item of $2,205.37 for damaged oil in tank No. 4 and by reducing the demurrage of the barge Teddy Burke by $300 and the charter hire of the barge Seneca by $600. As thus modified by a reduction of $3,105.37, and any interest on that amount, the decree is affirmed, with costs to the appellee.