## ORE STEAMSHIP CORPORATION v. D/S A/S HASSEL and five other cases.
### Nos. 264–269.

Circuit Court of Appeals, Second Circuit.
July 26, 1943.

Wharton Poor, of New York City (Haight, Griffin, Deming & Gardner and J. Ward O'Neill, all of New York City, on the brief), for claimant-appellant D/S A/S Hassel and others.

Henry N. Longley, of New York City (Bigham, Englar, Jones & Houston and Alfred Ogden, all of New York City, on the brief), for libellant-appellee Ore Steamship Corporation and others.

Robert E. Hill, of New York City (Hill, Rivkins & Middleton, George B. Warburton, and Robert J. Andrews, all of New York City, on the brief), for libellant-appellee R. Masso & Cia. and others.

William H. Woolley, of New York City (Bailey & Muller, of New York City, on the brief), for libellant-appellee Sociedad La Artistisa Ltda.

Ray Rood Allen, of New York City (Burlingham, Veeder, Clark & Hupper, of New York City, on the brief), for appellee Societe Mediterraneene D'Entreprises-Tanger.

Before SWAN, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

These appeals are from interlocutory judgments for libellants in six libels brought to recover for sea water damages to the cargoes of the various libellants sustained during a transatlantic voyage of the steamship Cypria. Five of these libels were in rem against the ship; and in the

first of these its owner, D/S A/S Hassel, appeared as claimant, while in the others the Norwegian Director and Curator of Shipping was the claimant. The sixth libel was in personam against the Societe Mediterraneene D'Entreprises-Tanger, its charterer, and D/S A/S Hassel and A/S Rederiet Odfjell, impleaded as its corporate owners. Two main issues are present in all six suits: (1) Was the cargo damage attributable to perils of the sea or to the unseaworthiness of the vessel; (2) and if to the latter, was due diligence exercised to make the ship seaworthy? The suit against the charterer and the owners of the vessel involves three additional issues: (1) Was the libel against them "brought within one year after delivery of the goods," as required by 46 U.S.C.A. § 1303 (6) and the bills of lading; (2) are the owners liable over to the charterers; (3) if so, are both Hassel, the owner, and Odfjell, the "managing owner," liable over?

On January 25, 1940, immediately after arriving from a voyage to South America, the Cypria was sent from New York to Philadelphia to load part of the cargo. En route she forced herself through heavy ice in the Delaware River and Bay for some 58 nautical miles. After loading at Philadelphia she headed for Baltimore. Again ice formations were encountered, and at one time she was forced to a full stop. More cargo was loaded at Baltimore, and the ship then returned to New York for a final load. She sailed for Horta, Azores Islands, on February 8, 1940. Storms were encountered on February 11, which continued through February 14, at times attaining a wind force of 9 to 10 on the Beaufort scale, and a sea force of 6 to 8. Two windows on the superstructure were knocked in, and a lifeboat was somewhat damaged. The ship was also required to reduce her speed somewhat. On February 15, some 10 feet of water was discovered in the cargo holds, which caused the damage to the cargoes. No soundings of these holds had been taken since February 11 because of bad weather.

When the ship reached Horta, a diver found that a rivet was missing in the shell plating about midship, a few inches inside of the starboard bilge keel. He plugged the hole, and the ship continued on to her destination, discharging her cargo in Spain and Portugal. While sailing light on the Spanish coast, she struck two rather severe storms and pounded heavily. At drydock in Lisbon, surveyors found her propeller blades and bilge keels bent, and a large number of rivets slack and in need of renewal.

Under the United States Carriage of Goods by Sea Act § 4, 46 U.S.C.A. § 1304, incorporated by reference in all the bills of lading, neither carrier nor ship is liable for loss resulting from unseaworthiness unless caused by a want of due diligence to make the ship seaworthy; nor is either responsible for loss arising from perils of the sea. The circumstances shown here fail to establish sea perils within the rather factual standard of the cases. Cf. Duche v. Thomas & John Brocklebank, 2 Cir., 40 F.2d 418 (hurricane weather, ventilators torn away; considerable damage to railings, doors, and pipe casings); The Sandfield, 2 Cir., 92 F.2d 663 (two lifeboats damaged, pipes and ventilators carried away, bridge rails bent, wheel chains parted, propeller shaft fractured); Philippine Sugar Centrals Agency v. Kokusai Kisen Kabushiki Kaisha, 2 Cir., 106 F.2d 32 (ship blown 160 miles off course, one lifeboat crushed, steel superstructure twisted and broken). The wind and sea during this crossing were not extraordinary for the season of the year; nor was damage therefrom other than minor.

Moreover, other circumstances show that the vessel was not seaworthy for the voyage. This might be presumed from the mere loss of the rivet in the absence of redeeming sea perils. Cf. The Warren Adams, 2 Cir., 74 F. 413, certiorari denied 163 U.S. 679, 16 S.Ct. 1199, 41 L.Ed. 316; The Rosalia, 2 Cir., 264 F. 285. In addition, it is clear that the owners failed to exercise due diligence to make the ship seaworthy. Cf. The Warren Adams, supra; The Mongolian Prince, D.C.E.D.N. Y., 27 F.2d 985, affirmed 2 Cir., 31 F.2d 1015; Compagnie Maritime Francaise v. Meyer, 9 Cir., 248 F. 881. Her last survey prior to the voyage—an eight-year-classification survey and the one upon which respondents rely solely to show due diligence—was at Marseilles in July, 1939. But it was stipulated that only a visual examination of the plates and riveting of the vessel was there made, the surveyor "looking up from the outside and looking down into the bilges from the inside after the limberboards had been removed." No hammer or drill test of the rivets was employed. And respondents at

best stress the fact that the double-bottom tanks were pressed up; but that could not show a defect in the plate riveting of the cargo holds. A mere superficial inspection of a ship is insufficient to establish an exercise of due diligence on the part of the owner to make her seaworthy. See The Anaconda, 2 Cir., 60 F.2d 898; The Citta di Palermo, 2 Cir., 226 F. 529; W. R. Grace & Co. v. Panama R. Co., 2 Cir., 285 F. 718; Warner Sugar Refining Co. v. Munson S. S. Line, D.C.S.D.N.Y., 23 F.2d 194, affirmed 2 Cir., 32 F.2d 1021.

There is, too, the further fact of the ship's forcing a passage through the ice of the Delaware River and Bay en route to Philadelphia. It is quite possible that some of this ice passed under the ship, striking the rivets and weakening them, even if then sound, to such an extent that one was thereafter dislodged by ordinary seas. But the evidence fails clearly to establish that the rivet lost was so affected—despite the admission of respondents' chief engineer that the ice probably caused the damage to the adjacent bilge keel and to the propeller blades.

■ This conclusion also disposes of respondents' further contention that if ice loosened the rivet no recovery can be had for the loss of the cargo loaded at Philadelphia, or that at least there should be some apportionment of the loss, since the damage to the rivet may have been fully or partially incurred on the trip to Baltimore. Were the ice the sole possible cause of the damage this might be a reasonable suggestion, but not here, where there are other pre-existing, and at least equally proximate, causes, which the shipowners failed to exercise due diligence to avoid. The burden was on the shipowners to bring the ship within the statutory exemption from liability for unseaworthiness. See 46 U.S.C.A. § 1304(1): "Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other persons claiming exemption under this section."

■ We have made this analysis to show that we agree with the district court, although we might well have rested on the point that its findings were certainly not "clearly erroneous." Petterson Lighterage & Towing Corp. v. New York Cent. R. Co., 2 Cir., 126 F.2d 992. Respondents criticize the findings as too general; but they seem fully adequate and understandable, supple-mented, as they are, by a careful opinion. Matton Oil Transfer Corp. v. The Dynamic, 2 Cir., 123 F.2d 999. So far as the record discloses, respondents sought no amendments or additions to the findings.

■ We turn, therefore, to the further issues presented by the libel in personam. This libel was filed March 5, 1941, within a year of the delivery of the goods on March 7, 1940. The charterer and the owners complain merely that process was not issued until May 23, 1941, long after the lapse of the year. It is too well settled for discussion, however, that the filing of the libel marks the institution of an admiralty suit. Laidlaw v. Oregon Ry. & Nav. Co., 9 Cir., 81 F. 876; Leveille v. Eastern S. S. Lines, D.C.S.D.N.Y., 12 F. 2d 486; United States v. Burns Bros., D.C. S.D.N.Y., 1 F.Supp. 219; 2 Benedict on Admiralty, 6th Ed. 1940, 313. Compare the similar F.R.C.P. 3; 1 Moore's Federal Practice 238-254, Cum.Supp.1942, 373.

■ More difficult is the question whether the owners, impleaded as respondents by the charterer, are liable to it, and therefore primarily liable over to the libellants. The charter party was dated London, December 10, 1938, and was negotiated by a London broker between Odfjell, the Norwegian "managing owners" of the vessel, which also belonged to a Norwegian port, and the Societe Mediterraneene D'Entreprises, its Moroccan charterer. The hire was payable at London, and arbitration was also provided for in London. The owners contend that the liability provisions of the charter party, interpreted according to English, rather than American, law, do not require them to indemnify the charterer.

We are not so convinced as the district court that the cases cited by it—London Assur. v. Companhia de Moagens do Barreiro, 167 U.S. 149, 17 S.Ct. 785, 42 L.Ed. 113; United States-Alaska Packing Co. v. Luketa, 9 Cir., 58 F.2d 944; The Pehr Ugland, D.C.E.D.Va., 271 F. 340; also Restatement, Conflict of Laws, §§ 358, 361—establish that the charter party need not be construed according to English law. But it is unnecessary finally to determine the matter, for even if the charter party be governed by English law, the shipowners do not escape liability over.

Article (1) of the charter party provides: "The vessel, being tight, staunch and strong, shall in every way be fitted for the usual cargo service and be main-

tained in the same state and class by the Owners during the entire duration of the charter." In Giertsen v. George V. Turnbull & Co., [1908] Sc.Sess.Cas. 1101, as well as in Tynedale Steam Shipping Co. v. Anglo-Soviet Shipping Co., 41 Com.Cas. 206, a shipowner was held not liable under a similar maintenance clause for losses occasioned by the unseaworthy condition of the vessel arising subsequent to its delivery and first use under the charter party. But in each case the shipowner had had no reasonable opportunity to remedy the defective condition of the ship. The holdings in no way impugn the shipowner's liability for damages from the vessel's unseaworthiness caused by his own lack of diligence to make her fit. See Luckenbach v. W. J. McCahan Sugar Refining Co., 248 U.S. 139, 150, 39 S.Ct. 53, 63 L. Ed. 170, 1 A.L.R. 1522, and English cases there cited; cf. Worms v. Storey, 11 Ex. 427.

■ That liability, we think, is clearly established by Art. (24) of the charter party: "The Acts of God, the State's enemies, fire, restraints of Princes, Governments and Peoples, and all dangers and accidents of whatever nature, as well as any latent defect or accident to the hull and/or machinery and/or boilers, even if resulting from negligence or default or error of judgment of pilots, Master, crew or other servants of the shipowners or of people for whom they are responsible, shall be mutually excepted during the currency of the present charterparty *provided they do not result from a lack of diligence on the part of the Owners or Managers of the vessel.*" [Emphasis supplied.] It is well settled that such language used in this context refers not merely to a failure of personal diligence on the part of the owners, but also to a failure of diligence by those employed by them to make the ship seaworthy. G. E. Dobell & Co. v. Steamship Rossmore Co., [1895] 2 Q.B. 408; Paterson Steamships v. Robin Hood Mills, 58 Ll. L. Rep. 33; London Rangoon Trading Co. v. Ellerman Lines, 14 Ll. L. Rep. 497.

■ Art. (8), concerning stevedoring and so titled, cannot aid the shipowners. While one sentence declares that "Owners are not to be responsible for shortage or damage to cargo," considered in the context, it imports only that the owners shall not be responsible for damage to cargo in loading. Cf. Park v. Duncan & Sons, 35 Scot. L.R. 378.

■ Respondents Odfjell, the "managing owners" of the charter party, and Hassel, the actual owner, although not named in the charter party, also object to the entry of judgment by the district court against them both and not against one to the exclusion of the other. Apparently the legal ground for the objection is the elusive agency doctrine of election, to the effect that where an undisclosed principal and his agent are sued jointly, there must be an election to hold only one of them sometime prior to judgment. Cf. The Jungshoved, 2 Cir., 290 F. 733, certiorari denied 263 U.S. 707, 44 S.Ct. 35, 68 L.Ed. 517; Johnson & Higgins v. Charles F. Garrigues Co., 2 Cir., 30 F.2d 251. This harsh doctrine, resting at most on a rather barren logic, appears to be giving way to the more equitable view that, in the absence of some estoppel, there is no election until a judgment is actually satisfied; indeed, a recent New York statute, sponsored by the Law Revision Commission, so provides explicitly, N.Y.C.P.A. § 112-b, added in 1939; Rep. of Law Rev.Com'n 1939, 267, 281-284; 52 Harv.L.Rev. 1371, 1372; Election of Remedies: A Delusion? 38 Col.L.Rev. 292, 319-321.[1] In any event, there seems no occasion to extend it. Here neither the pleadings nor the record makes clear the exact relationship between the owner and the managing owner or the extent of its disclosure to the charterer, and the district court made no finding on the subject. The question appears not to have been raised at the trial[2] and is not made in respondents' assignments of error here. Accordingly we see no reason for modifying the judgment on this point.

Affirmed.

---

[1] Note that in The Jungshoved, supra, Mayer, J., dissented on the opinion of L. Hand, J., below, in D.C.S.D.N.Y., 272 F. 122, while in the Johnson & Higgins case, which reversed Knox, J., in D.C.S.D.N.Y., 22 F.2d 454, Augustus N. Hand, J., dissented with opinion.

[2] That even where the doctrine is applied, election must be demanded at the trial, or is waived, see Craig v. Buckley, 218 Cal. 78, 21 P.2d 430; O'Grady v. Howe & Rogers Co., 166 App.Div. 552, 152 N.Y.S. 79; Central Lumber & Mfg. Co. v. Reyburn-Laird Real Estate Bldg. & Const. Co., 189 Mo.App. 405, 176 S. W. 509; and generally, 118 A.L.R. 701.